MARION C. AND RUTH W. GRAY, ET AL.,[1] Petitioners *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 15156-82, 18923-82, 1192-83, 4223-83, 6463-83, 17018-83, 18518-83, 31411-83, 31787-83.

Filed May 19, 1987.

*William Randolph Klein,* for the petitioners.
*James F. Kidd* and *Robert R. Rubin,* for the respondent.

NIMS, *Judge:* Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes:

| Docket No. | Year | Deficiency | Additions to tax | |
|---|---|---|---|---|
| | | | *Sec. 6651(a)*[2] | *Sec. 6653(a)* |
| 15156-82 | 1978 | $24,402.66 | - - - | - - - |
| | 1979 | 53,949.48 | - - - | - - - |
| 18923-82 | 1978 | 4,972.00 | - - - | - - - |
| | 1979 | 11,936.00 | - - - | - - - |
| 1192-83 | 1979 | 13,676.00 | - - - | - - - |
| 4223-83 | 1979 | 18,114.00 | - - - | - - - |

[1]Cases of the following petitioners are consolidated herewith: Joseph D. and Wanda Auberger, docket No. 18923-82; David L. Kennedy, docket No. 1192-83; Larry R. and Sondra K. Adkins, docket No. 4223-83; Edward M. Becker and Alice M. Becker, docket No. 6463-83; John S. Crosby and Carol J. Crosby, docket No. 17018-83; Manual and Mariana Encinas, docket No. 18518-83; Wilfred and Vera Clegg, docket No. 31411-83; John Armstrong and Kathryn Armstrong, docket No. 31787-83.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

|  |  |  | Additions to tax | |
|---|---|---|---|---|
| Docket No. | Year | Deficiency | Sec. 6651(a)[2] | Sec. 6653(a) |
| 6463-83 | 1979 | $11,247.00 | - - - | [3]$562.35 |
|  | 1980 | 25,794.00 | - - - | - - - |
| 17018-83 | 1979 | 14,311.00 | $2,582 | 896.00 |
| 18518-83 | 1979 | 15,025.00 | - - - | 751.25 |
| 31411-83 | 1979 | 166,524.00 | - - - | - - - |
| 31787-83 | 1979 | 13,294.00 | - - - | 665.00 |
|  | 1980 | 12,419.00 | - - - | 621.00 |

The issues for decision are whether (1) petitioners properly deducted various amounts as development expenses under section 616(a); (2) some of the petitioners acted negligently with regard to these deductions; (3) the addition to tax for untimely filing a tax return is due from petitioners in docket number 17018-83; and (4) interest on substantial underpayments attributable to tax-motivated transactions is due from petitioners under section 6621(c).

FINDINGS OF FACT

At the time their petitions were filed, the States of residence of the respective petitioners were as follows:

| Name | Docket No. | States of residence |
|---|---|---|
| Marion C. and Ruth W. Gray | 15156-82 | Ohio |
| Joseph D. and Wanda Auberger | 18923-82 | Ohio |
| David L. Kennedy | 1192-83 | Ohio |
| Larry R. and Sondra K. Adkins | 4223-83 | Indiana |
| Edward M. Becker and Alice M. Becker | 6463-83 | Minnesota |
| John S. Crosby and Carol J. Crosby | 17018-83 | California |
| Manual and Mariana Encinas | 18518-83 | California |
| Wilfred and Vera Clegg | 31411-83 | California |
| John Armstrong and Kathryn Armstrong | 31787-83 | California |

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

*Introduction*

This case is an outgrowth of a tax shelter promotion called "Gold for Tax Dollars" (sometimes herein referred to

---

[3]At trial, respondent conceded the sec. 6653(a) addition to tax insofar as petitioners in docket No. 6463-83 are concerned.

as GFTD) sponsored by an entity called International Monetary Exchange (IME). Pursuant to a survey conducted by the Internal Revenue Service (IRS), the IRS identified a number of Gold for Tax Dollars investors and the amount of the deductions claimed by them as mining development expenses derived from the IME promotion, as follows:

| Year | Number of investors | Amount of deduction |
|---|---|---|
| 1978 | 356 | $13,012,329 |
| 1979 | 1,877 | 70,988,760 |
| 1980 | 792 | 34,618,355 |
| Total | 3,025 | [4]118,619,444 |

Petitioners in this case are among the foregoing 3,025 investors.

Petitioners claimed the following deductions based upon their IME investments:

| Docket No. | Petitioners | Year | Cash | Nonrecourse loan (1978) or option sale (1979 or 1980) | Total deduction claimed |
|---|---|---|---|---|---|
| 15156-82 | Marion C. Gray and Ruth W. Gray | 1978 1979 | $10,000 10,000 | $40,000 40,000 | $50,000 50,000 |
| 18923-82 | Joseph D. Auberger and Wanda Auberger | 1978 1979 | 4,000 4,000 | 16,000 16,000 | 20,000 20,000 |
| 1192-83 | David L. Kennedy | 1979 | 5,000 | 12,795 | 17,795 |
| 4223-83 | Larry R. Adkins and Sondra K. Adkins | 1979 | 4,000 | 16,000 | 20,000 |
| 6463-83 | Edward M. Becker and Alice M. Becker | 1979 1980 | 5,000 7,000 | 15,000 28,000 | 20,000 35,000 |
| 17018-83 | John S. Crosby and Carol J. Crosby | 1979 | (basis for deduction not stated in record) | | 20,000 |
| 18518-83 | Manual Encinas and Mariana Encinas | 1979 | 10,000 | 18,000 | 28,000 |
| 31411-83 | Wilfred Clegg and Vera Clegg | 1979 | (basis for deduction not stated in record) | | 155,000 |
| 31787-83 | John Armstrong and Kathryn Armstrong | 1979 1980 | 5,000 5,000 | 15,000 15,000 | 20,000 20,000 |

---

[4]The parties stipulated the number of investors identified and the amount of the deductions claimed. In *Saviano v. Commissioner*, 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985), we noted that respondent had disallowed more than $120 million in IME GFTD shelters involving approximately 3,000 taxpayers. The discrepancy in the amount of disallowed deductions as stated in *Saviano* and as stipulated here is not explained.

## Nature of Promotion

The 1978 IME promotion was tied to a gold mining concession in Panama. The 1979 and 1980 promotions were tied to a gold mining concession in French Guiana.

The theoretical factual basis upon which a 1978 investor would proceed is described in the following excerpts from an opinion letter dated May 15, 1978, to one James Mongello, written by James Victor Kosnett of the law firm of Kallen, Grant, May, and Tremblatt of Hollywood, California:

You contemplate working a foreign gold mine claim. Based on assay reports, each cubic meter of auriferous gravel on the subject property should produce from between .77 and 3.1 grams of gold. The claim owner will grant to you a lease to enter upon his property and mine the gold, in return for a royalty equal to one-half the gold yield (computed after Panama has exacted its tax on same, and after you have recouped all of your development expenses.) Anticipated expenses are $40,000 for the hiring of an independent claim operator who, with his equipment, will develop the claim. Due to time and weather limitations, it is anticipated that you will only develop the claim this year, and not enter into production until the following year. It is your intention to initially pay the independent claim operator the sum of $10,000 out of your own pocket, and to pledge your mineral lease to a lending institution as security for a loan of $30,000 which will pay the balance of the development expenses. Moreover, the claim operator will agree to place with you $5,000 in gold as a work performance surety to assure that the work will be completed, the royalty will be paid to the claim owner and the remaining gold yield will accrue to you. You are a "cash basis" taxpayer.

As we understand the terms of your mining venture, you are borrowing three-fourths (3/4) of the funds needed to pay your development expenses; you have pledged your mineral lease as the only security for the loan, which is to be paid back to the lender as the gold is extracted and sold. The loan is strictly a nonrecourse transaction, for which you bear no personal liability whatsoever. If insufficient gold is produced to pay principle [sic] and interest, the lender cannot proceed against you for the balance—rather, the lender is limited to its security interest. * * *

You have informed us that, for the purpose of mining gold, you have leased a mineral claim; that the terms of the lease permit you free access to the claim, and permit you to develop the claim and extract the gold therein how and when you see fit; that you have hired an agent, who in turn has hired a contractor to develop the claim for you; that you may fire the agent and/or the contractor at will, and replace them with whatever personnel you please; that the mineral claim lessor has leased other claim properties, adjacent to yours, to other parties; that these parties have also hired the same agent and the same contractor; and that you have not entered into any agreements with any adjacent claim

holders, or any other third parties, to cooperate or participate in any way with the development of your claim, the extraction of your gold, and/or the subsequent sale of your gold. * * *

The theoretical factual basis upon which a 1979 or 1980 investor would proceed is described in the following excerpt from an opinion letter dated June 18, 1979, to "T. T. Smith III" (an alias used by Gerald T. Rogers) of IME from attorney Kosnett:

As you have explained to us, United States citizens will be able to lease gold mine claims in South America. These mining claims have been shown to contain deposits of gold ore of sufficient quantity and quality to reasonably justify commercial exploitation. In return for the lessee's payment of a royalty (which is due and payable only after all costs of the lessee have been recouped), and his promise to spend a minimum amount of money in development of the claim, the claim owner will convey the entire working or operating interest in the mine to the lessee, who shall be entitled to enter upon his claim and extract gold and other valuable minerals. Each lessee will develop and mine his own distinct, separate claim. Although you intend to assist the lessee, making available your services to aid the developing of the claims by way of suggesting agents, hiring contractors, and so forth, each lessee is free to discard your advice and/or refrain from taking advantage of any or all of your services, and proceed to mine his claim on his own. In addition, each lessee may use your facilities to sell an option for some or all of the minerals to be extracted from the claim. This option could be exercised only after the lessee has recouped his costs and paid the royalty. Further, should the lessee so desire, the consideration paid for the sale of the option can be applied directly to the cost of development of the claim, thus satisfying, to some extent, the lessee's obligation to spend a certain minimum amount on development of the claim. Once again, however, the lessee is free to decline to sell an option through you, and/or through anyone else, to anyone. Nor is the lessee obligated to use the money he receives from the sale of an option, and/or any specific funds whatsoever, in order to develop his claim; rather, he may use any funds he so desires, so long as he spends the minimum amount of money specified in the lease agreement. The yield from each claim will be independent from every other claim (i.e., no "pooling" of the gold); and each lessee will determine when, where, how, and at what price to sell his gold. The lessees are "cash basis" taxpayers.

The 1978 Federal income tax motivation and rationale are shown in the following excerpt from a summary made available to prospective investors:

In brief, the law provides that as a miner you can deduct the development cost in the year incurred. By borrowing nonrecourse $3 for

every $1 of your own and by paying the total funds out as development expenses this year, a 400% tax shelter occurs. (A 400% tax write-off will turn 50% of your tax liability into "spendable Cash" and the other 50% into a "Gold Asset.")

You can start with as little as $5,000 and in increments of $2,500 thereafter, but for illustration purposes, if you or your corporation needs a $100,000 tax write-off you would:

1. Put up $25,000.

2. Borrow "nonrecourse" $75,000 (completely tax deductible under the 1976 Act and the 1978 Tax Reform Act.)

3. Pay the total $100,000 out as deductible development costs this year.

4. Expect, based on assays and current prices, to recover a gold profit of approximately $50,000.

TAX BENEFITS

1. $100,000 tax deduction from your taxable income this year.

2. Realize a federal tax savings up to $70,000.

3. Pay no taxes until *you decide* to sell the extracted gold.

RESULT: GOLD FOR TAX DOLLARS, PLUS UP TO $45,000 IN SPENDABLE CASH!

The 1979 Federal income tax motivation and rationale are shown in the following excerpt from a flyer entitled "Gold for Tax Dollars" (the heading printed in type reminiscent of a California gold-rush-era broadside):

1979 TAX SHELTER

TO:        50% TAXPAYER AND TAX PROFESSIONAL

FROM:    INTERNATIONAL MONETARY EXCHANGE

SUBJECT: 400% TAX WRITE-OFF (No Loans - No "At Risk" Problems)

The tax shelter business strategy presented in the attached brochure * * * explains when you lease a gold placer deposit that has proven reserves, you can simply sell an option to raise 75% of the capital requirement. You then put up 25% of your own money, expend it for development costs and a 4 to 1 tax deduction is created. (As of the 1976 Act no income is reportable until the option expires or is exercised.)

The 1980 IME tax shelter program incorporated the same option sale rationale, except that a 500-percent, rather than 400-percent tax writeoff was promised.

In connection with the 1978 program, IME issued "IN-STRUCTIONS" showing investors how to arrive at the amount of the desired tax deduction, as follows:

### INSTRUCTIONS

The minimum capital requirement is $5,000 which can result in a $20,000 tax write-off or 4 times the cash you invest. The capital requirement can be increased in increments of $2,500, such as $5,000 plus $2,500 equaling $7,500 times 4 equals (=) a $30,000 tax write-off and so on up.

The following chart correlates, cash requirement to tax write-off (deductible expenses) to cubic meters to be mined under your Mining Claim Lease Agreement.

| Cash development capital | | | Desired tax write-off (deductible expenses) | | Total cubic development cost per M3 | | Total cubic meters developed for mining |
|---|---|---|---|---|---|---|---|
| $5,000 | × 4 | = | $20,000 | divided by | $1.60 | = | 12,500 |
| 7,500 | × 4 | = | 30,000 | do. | 1.60 | = | 18,750 |
| 10,000 | × 4 | = | 40,000 | do. | 1.60 | = | 25,000 |
| 12,500 | × 4 | = | 50,000 | do. | 1.60 | = | 31,250 |
| 15,000 | × 4 | = | 60,000 | do. | 1.60 | = | 37,500 |
| 17,500 | × 4 | = | 70,000 | do. | 1.60 | = | 43,750 |
| 20,000 | × 4 | = | 80,000 | do. | 1.60 | = | 50,000 |
| 22,500 | × 4 | = | 90,000 | do. | 1.60 | = | 56,250 |
| 25,000 | × 4 | = | 100,000 | do. | 1.60 | = | 62,500 |

If a greater tax deduction is desired than indicated in the above chart, just divide your desired tax write-off by 4 and that will equal the cash capital requirement. To obtain the number of cubic meters that must be mined under the mining lease, divide the tax write-off you desire by $1.60.

### The instructions further provided that:

Upon payment of the mining development expense, copies of the invoices and cancelled checks for mining services paid for by your agent, will be sent for tax purposes. Your records will include Mineral Claim Lease, Loan Agreement, Paid invoices, and cancelled checks all executed on or before December 31, 1978.

Similar charts were made available in connection with the 1979 and 1980 programs, except that the cubic meter was to be determined by dividing the desired tax writeoff by $2 instead of $1.60.

### *Implementation of the Promotion*

Pursuant to the above-mentioned instructions, investors were asked to sign, among other things, a Mineral Claim

Lease, which referred to the investor as the "Miner" and stated that by signing the lease he was leasing real estate (described and hereinafter called *Leased Premises* (emphasis added)), also designated by lot number, in Tuquesa Mining Properties Contract No. 35, Republic of Panama, containing a stated number of "cubic meters of auriferous gravel." An individual whose signature is indecipherable signed as secretary for "Diversiones Internacionales, S. A., Lessor" (hereinafter called DISA). DISA is described in a document stipulated by the parties as a "shell company" of Rogers. The miner is given the right, among other things, to "develop" all ore-producing soils and sands to exhaustion or until the expiration of the Tuquesa mining concession, to use, develop, etc., surface and underground waters, build and use roads, pipelines, heavy machinery, timber on the property, etc. DISA as lessor is to receive 50 percent of the recovered gold "at site" after deduction of costs and taxes.

Investors were also asked to sign an "Appointment of Agent and Authorization to Negotiate," appointing IME in this capacity. IME as agent was to obtain a mineral lease approval to remove the gold; arrange for a contractor to "develop the claim ready for processing the auriferous gravel for $1.60 per cubic meter and pay contractor the development capital herein committed together with the proceeds advanced as lender"; accept the mineral loan agreement (hereinafter described) as lender; and to obtain the miner's share of the gold and use it as loan collateral, and endorse and cash checks made out to the miner from sales of gold to comply with the loan agreement.

The loan agreement, referred to above, between IME and the miner called for a maximum loan of 3 times the cash invested secured only by the mineral lease agreement and any gold produced, the loan proceeds to be advanced to the above-mentioned contractor for its services. The 10-percent interest provided under the mineral loan agreement, if not paid annually when due, was to be "deemed to be a new advance by the Lender to the Miner and shall be charged to the Miner's account as such."

Similar documentation was provided in connection with the 1979 and 1980 programs, with the following exceptions: the mineral lease claims were for a designated "zone," to

which a claim number was assigned, on the "PI Concession" located in French Guiana, the claim being alleged to contain a stated amount of cubic meters of auriferous gravel; the lessor was Compagnie Miniere Paul Isnard, S.A. (CMPI SA); and instead of entering into a nonrecourse loan agreement, the miner "sold" an option for an amount equal to 75 percent of the amount of the tax deduction claimed (in some cases 80 percent), exercisable only "after the gold has been extracted." In some cases IME, or its assigns, is designated as the optionee, but in many others no optionee is designated.

The following chart summarizes the total deductions claimed by all IME investors identified by the IRS for 1978 through 1980, determined by the cubic meters selected by the investors to obtain the desired tax deductions:

| Year | Cost per cubic meter | Total cubic meters Panama | Total cubic meters French Guiana | Total deductions |
|------|------|------|------|------|
| 1978 | $1.60 | 8,132,706 | - - - | $13,012,329 |
| 1979 | 2.00 | - - - | 35,494,380 | 70,988,760 |
| 1980 | 2.00 | - - - | 17,309,178 | 34,618,355 |
| Totals | | 8,132,706 | 52,803,558 | 118,619,444 |

One of the ways by which Gold for Tax Dollars investors were initially solicited by IME was through mass mailings by a company called Telecom located at first in Beverly Hills, California, and later in Woodland Hills, California. Telecom sent out IME brochures and other promotional materials to names on a computerized list. Sales that were made through brokers generated commissions for the brokers, but the payment by an investor was usually in the form of the investor's own check. IME also maintained a room in the offices occupied by it and Telecom containing a number of telephones manned by salesmen soliciting orders for GFTD investments.

When a check came in, a clerical assistant working for Telecom would prepare a "package" to be sent to the client. This included copies of the mineral claim lease, the mineral loan agreement (for 1978) or the option agreement (for 1979 or 1980), a copy of a check drawn on the Republic Bank of Panama by IME and payable to Tuquesa Amalgamated,

representing the "development check," and the agency agreement.

The IME checks were sent to Panama where they were canceled by the bank and then returned to IME in California, where they were placed in the respective client's file. Eventually, when the paperwork got too heavy, it was all sent to Panama and processed there.

When the client's checks to IME originally came in to commence the investment, they were first xeroxed and the check itself was then sent to Panama, presumably to be cashed. The xerox copy formed the basis for processing the client's transaction. A clerical worker would do the following:

He or she would type an IME check payable to Tuquesa Amalgamated in the amount of the development cost, which would be sent to Panama to be signed in the name of "T.T. Smith." As previously stated, the name "T.T. Smith" was an alias used by Gerald L. Rogers, the principal promoter of the Gold for Tax Dollars scheme.

The mineral claim lease would be completed by the clerical person who would fill in a lot number, the cubic meters being purchased, and the date. The clerical person would determine the number to be filled in for the cubic meters by dividing $1.60 or $2, depending upon the year involved, into the total amount of the purported investment in the manner indicated in the chart contained in the above-mentioned instructions. For example, in a specimen mineral lease agreement stipulated by the parties, the indicated 25,000 or 20,000 cubic meters would be derived by starting with the client's $10,000 cash investment, multiplying that figure by four to obtain the purported $40,000 total investment (consisting of the client's cash of $10,000 plus nonrecourse loan or option sale proceeds of $30,000)— also the amount of the desired tax writeoff—and then dividing $40,000 by $1.60 to obtain the 25,000 cubic meter figure or by $2 to obtain the 20,000 cubic meter figure.

The lot number placed by the clerical assistant on the mineral lease claim would be done in sequence with a new sequence starting anew at the beginning of each year, except in 1978, when the sequential numbering was begun in October of that year. Thus, the first investor in a given

year would get lot number 1, the second would get lot number 2, etc.

The lot numbers also were used to identify the broker involved with a particular client. For example, a specimen mineral lease bearing the number J596 would indicate that the investment was handled by a broker with the code letter J, and that the client was investor number 596 for that year. A broker's commission of 20 percent of the investor's cash was paid by IME. This amount was computed and paid by the clerical assistant handling the paperwork on the transaction.

As part of the 1978 transactions, the clerical worker also filled in a mineral loan agreement. On these forms the date and amount were filled in.

The date which was used on the documents was the date on the client's check, except that when the check was dated shortly after the close of a preceding year, the documents were dated December 31 of such preceding year.

IME maintained a file for each of its clients which included the original mineral claim lease, an invoice, and the canceled development check. As stated, copies went to the client.

The invoice was rendered by a "development" company (for example in 1980, General Miniere S.A.) to the investor, the "work description" being to "develop the above described placer mining claim as necessary to float wash barge on to property or to ready claim to accomplish extraction." A typical invoice also contained the legend "ALL JUNGLE WORK MUST BE PAID IN ADVANCE." In a specimen transaction offered into evidence by petitioners, a 1980 General Miniere S.A. invoice for $50,000 was paid by a $10,000 cashier's check from the investor and a $40,000 IME check to General Miniere, S.A. The investor also received a transaction confirmation slip from IME showing the sale by the investor of one "General Miniere S.A. Paul Isnard Gold Option" for $40,000. The purchaser of the option is not indicated. No development work was ever performed by General Miniere S.A.

In connection with its 1979 and 1980 promotions, IME utilized 14 different option forms, all a variaton on the

single theme hereinafter discussed. For example, one of the option forms used by IME provided:

GOLD OPTION

For _____ ($ _____ )
Option premium spelled out

the undersigned hereby grants an Option to purchase all the gold contained in the Mineral Claim Lease attached hereto and subject to—

A. 1. The 3% BRGM Royalty
   2. Extraction Costs
   3. Development Costs
   4. Lessor royalty of $1 per gram

B. The above costs will be paid at the time the gold is extracted by selling an adequate amount of gold recovered from the site referred to in the Mineral Claim Lease. After the above expenses have been paid, the "exercise price" for the remaining gold shall be $3 per gram. This exercise price of $3/gram shall be paid for "at site" and at my option "in kind."

C. The Option Holder agrees that the "Option" can only be exercised after the gold has been extracted. The undersigned agrees and understands that the Option Holder has first right of refusal for releasing the Mineral Claim Lease if necessary arrangements are not made to extract gold prior to the expiration date. The expiration date of the "Option" and Lease is _____ , 1987.

Done this _____ day of _____ , 1980.

_____
Miner

Wayne Holm was a salesman for IME in 1978 and 1979, working out of Seattle, Washington. Holm at times used the alias "Michael M. Murphy." In 1980, he took over IME financial operations in Panama. Holm signed letters and checks in the name of Michael M. Murphy. If moneys had to be transferred from IME, Holm took care of it. He would get authorization from Rogers, and they would establish some kind of code. Then he, Holm, would call a Mr. Latoraca at the Republic National Bank and mention the code, whereupon funds would be transferred from IME's account at Republic National Bank.

Mariel Fonseca was the in-house attorney for IME. He was also the attorney for Tuquesa Amalgamated, DISA, and General Miniere. His office was in IME's suite of offices on the 11th floor of the Bank of Boston building in Panama City, Panama.

The IME promotional material emphasized that each investor's "mine" was to be "operated as a sole proprietorship. There are no limited partners." The significance of this position was, as explained in the above-mentioned opinion letter of James Victor Kosnett, to avoid "the 'at risk' limitation rules applicable to partnerships (IRC Section 704(d))."

### Mining Activities

In February 1978, Tylor F. Kittredge, president of Tuquesa Mining, S.A. (TMSA), and Rogers, as the agent for DISA, agreed that Rogers would raise approximately $1 million through a tax shelter package to place TMSA's Panama Tuquesa Concession No. 35 in production. TMSA's mining concession was granted by the Panamanian Government, to which TMSA was responsible for properly exploiting the concession. IME was the company which sold the tax shelter package in the United States. TMSA was to do the mining. The concept was to implement a mining plan for the exploitation of the concession which had earlier been developed by a man named G.G. Bryan. Under TMSA's agreement with DISA, DISA was to provide the operating capital as well as the necessary supplies and equipment, and profits were to be divided on the basis of 65 percent to DISA and 35 percent to TMSA.

Rogers, through his shell company DISA, went into default on December 27, 1978. As of November 15, 1978, no field work had been done during the preceding 18 months, except maintenance of a camp and runway and a brief foot survey of a possible road route from the mouth of Rio Tupisa to Punta Gallina.

On June 21, 1979, a new agreement was signed by TMSA and DISA with Norsul Oil & Mining, Ltd., a Canadian corporation headquartered in Albany, Georgia (Norsul), replacing TMSA as the miner, under which Norsul was to implement the Bryan mining plan. TMSA's role thereafter was limited to serving as inspector to determine that the terms of the agreement and legal obligations to the Republic of Panama were being met.

Dr. Wayne E. Fowler, an experienced and competent geologist and miner, was president of Norsul. During all

relevant periods, Norsul's stock was publicly traded in the over-the-counter market in the United States.

The following amounts were spent during 1978 on the Tuquesa concession:

Three days' services by Tylor Kittredge .............. $450
Advance payment to Consultores Geologicas, S.A......1,000

As to the Tuquesa concession, the period between November 15, 1978, and August 10, 1979, was spent mostly negotiating between DISA and TMSA concerning the financing and mining of the operation.

DISA and Norsul went into default on the June 21, 1979, agreement on March 1, 1980. Conciliation of the differences between DISA/Norsul and TMSA was conducted under the direction of the Panama Bureau of Mines, but ultimately, in March 1981, Panama canceled the concession, and mining ceased. The Government resolution cited the concession's unprofitability and the alleged violation by DISA of a Panamanian code provision requiring prior Government approval before publicly disseminating information about the value of a mining concession. Also, it was Fowler's understanding that Panama was unhappy because the U.S. Government had sent SEC and IRS personnel to Panama to investigate the exploitation of the concession.

During 1979, the following amounts were expended by IME in connection with the Panama concession:

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
| Feb. 4, 1979 | TMSA | General | $25,000 |
| Mar. 15, 1979 | TMSA | Moving tractor to site | 10,000 |
| Mar. 19, 1979 | TMSA | Funding project | 10,000 |
| Aug. 31, 1979 | Consultores Geologicos, S.A. | Caretaker services and miscellaneous | 3,000 |
| Nov. 2, 1979 | Consultores Geologicos, S.A. | Caretaker services | 1,500 |

In April 1979, Norsul sold 1,250,000 shares of its common stock, equal to 25.9 percent of its issued and outstanding common shares, to CMPI SA. It was understood by Fowler that Norsul would use the funds thus generated to obtain equipment to undertake operations in Panama and French Guiana.

During 1979 and 1980, any work done on the Panama property was done by Norsul. Norsul sent its bills to DISA,

which were paid by IME. For the period March 15, 1979, through April 30, 1981, Norsul billed DISA for services rendered in connection with the property in the total amount of $1,193,231.

When the Panama concession was canceled by the Panamanian Government, IME purported to assign the claims of the investor-miners on the Panamanian property to the French Guiana property, which property IME represented would be developed in accordance with "your Tuquesa instructions to us."

Norsul worked the Ox Bow area of the Tuquesa concession. Norsul surveyed three tracts in the Ox Bow area. One was at the entrance, one at the exit, and the third was the rest of the survey, which went into one big block.

Fowler first met Rogers around the end of the third quarter of 1978. Fowler had been working a gold property in French Guiana, and he represented to Rogers that he, Fowler, was trying to obtain financing for that property so he could increase production. In March 1979, Norsul signed a contract with Compagnie Miniere Paul Isnard SARL (CMPI SARL) to undertake the operations of the French Guiana mining property known as Paul Isnard. Norsul worked the property from March 1979, until approximately the middle of April 1982.

Norsul's actual work included the mapping and surveying to establish the metes and bounds of the area. Norsul had control of the preparation and completion of all the infrastructure, which included buildings and roads and diversion of water courses, or cleaning up water areas to bring water into an area where mining was to be done, and was in charge of the purchase of equipment. Norsul bought essentially all the equipment that went in. During the period Norsul worked the property, some gold was extracted.

As to French Guiana investors solicited by IME, the mineral claim leases were signed by Compagnie Miniere Paul Isnard, S.A., which was owned by CMPI SARL, which in turn was 94-percent owned by DISA. Fowler's understanding of French law was that all investors had to be approved by the French Government.

During the time it worked the Paul Isnard property, Norsul laid out surveys on most of the major creeks that

were a part of the Paul Isnard property, and laid out a survey and developed plots on land tracts. Norsul had not completed its surveying and plotting work when it was relieved of its duties in French Guiana in 1982. One of the maps produced at trial included a plot mined for a Dr. Yuter near the village of Citron. This was the only specific plot worked for an IME investor in either Panama or French Guiana.

Norsul was instructed to lay out in each creek area, where gold was to be mined in the Paul Isnard area, plots which took the form, as nearly as possible, of rectangles. They were also to contain, as nearly as practical, "10,000 cubic meters" per plot. There is substantial confusion as to the relationship between the size of the rectangular plots laid out on Norsul's grid and the amount of auriferous gravel they were represented (in the mineral leases and elsewhere) to contain.

The IME investors never had their mineral claim leases approved by the French Government. There were approximately 2,500 IME investors in the IME promotion insofar as it related to French Guiana. Overall, Norsul laid out between 100 and 200 plots. Except for Yuter, it was not possible to locate any specific plot by referring to the claim number assigned to any investor by IME.

## Miscellaneous Additional Facts

Edward M. Becker, one of the petitioners herein, made IME Gold for Tax Dollars investments in 1979 and 1980. As of the time of trial, Becker was a Northwest Airlines 747 captain. He invested $4,000 cash in 1979, and $7,000 cash in 1980. On the basis of these payments, and the purported sale of a $16,000 option in 1979, and a $28,000 option in 1980, he deducted $20,000 in 1979, and $35,000 in 1980.

Becker twice visited French Guiana: first in April 1984, and again on March 9, 1986. By virtue of his airline connection, Becker was able to fly "jumpseat" on Air Guiana from Miami, Florida, to Georgetown, Guyana. From there he flew to Paramaribo, Surinam, then took a ferry across a river and from there took a bus to St. Laurent, French Guiana, which was near the mine site. CMPI SARL had an office near St. Laurent, and Becker, with substantial

difficulty, was able to arrange a meeting with the managing director. Later he was flown in a small plane to the mine site, where he observed some mining taking place.

Becker "didn't exactly know how I fit in down there. * * * I didn't even know if I was going to get out of there alive." On his trip to French Guiana in 1986, Becker was refused entrance to the mine site. Becker was unable to locate his own claims in French Guiana.

Dale Aborn, a securities broker, deals with investments such as the Gold for Tax Dollars investment. Aborn's concept of the security industry's "due diligence" requirement as it pertained to him was to find out all the information he could about the product he planned to sell and the people involved. Aborn obtained a Dun and Bradstreet report on IME and visited the mine site in French Guiana in September 1979. In addition to selling GFTD interests, he himself was also an investor.

If a lease parcel is considered in isolation, development costs of $40,000 would be inappropriate for a lease containing 10,000 cubic meters of placer gravels.

## ULTIMATE FINDING OF FACT

The IME Gold for Tax Dollars promotion was a fraudulent factual sham.

## OPINION

Except for some procedural dissimilarities (e.g., amounts invested and identities of investors), the tax shelters promoted in the offering memoranda in *Saviano v. Commissioner*, 80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985), and *Smith v. Commissioner*, T.C. Memo. 1986-101, are identical to those presented in the offering memoranda here. The portion of the deductions taken by petitioners insofar as they relate to nonrecourse loans in 1978 and sales of options in 1979 and 1980 will not be allowed since they are in no way unlike those disallowed by this Court in *Saviano*.

The *Saviano* case was presented to the Court on cross-motions for summary judgment. The parties agreed that, for purposes of that case, the Court could assume that the various steps of the transactions in dispute were consum-

mated in the manner set out in the stipulated documents. Respondent there challenged only the bona fides of the 1978 nonrecourse notes and the 1979 and 1980 options. Thus, respondent, in effect, conceded the deductibility of the cash payments in *Saviano*. Respondent makes no such concession here, nor does he concede the bona fides of any of the documents or transactions involved here.

During the trial of this case, petitioners' counsel represented to the Court that valid service of a subpoena had been achieved to require the attendance of Gerald L. Rogers at the trial. At the conclusion of all other testimony, the trial was recessed for a day to accommodate Rogers who was represented to be engaged in litigation in another court. Ultimately, Rogers was not called to testify and did not appear. Petitioners did not seek the assistance of the Court to enforce the subpoena, although it was made clear to petitioners' counsel that such course of action was available.

It is highly unlikely that, had he testified, Rogers' testimony would have affected the result we reach in this case. While his testimony conceivably could have been marginally useful in clearing up the relationships among the various corporations behind whose facades he maneuvered, his testimony, if given, would likely have been essentially self-serving and at odds with the objective evidence placed in the record. While the record is far from clear or complete in places, a factual framework was constructed justifying inferences which on the whole are unfavorable to petitioners' case.

Petitioners complain repeatedly that we proceeded to decision on incomplete facts in *Saviano*, and that the exposure to daylight of all the facts will make it clear that petitioners are entitled to their entire deductions. They have now been afforded the opportunity to fully present evidence to support their position, and the evidence not only fully supports our summary judgment in *Saviano*, but conclusively establishes that the entire IME Gold for Tax Dollars promotion, and all the transactions it entailed, were fraudulent factual shams. *Julien v. Commissioner*, 82 T.C. 492 (1984).

We do not deem it necessary to comment on all aspects of our findings of fact, which for the most part speak for

themselves. The record discloses that Gerald L. Rogers, who masterminded the Gold for Tax Dollars promotion, at first was proceeding on two tracks. His encounters with Kittredge in 1978, and subsequently with Fowler, apparently at first instilled in him the idea that gold mining concessions controlled by Kittredge and Fowler could be exploited and financed primarily for his (Rogers') own benefit by selling tax shelter investments keyed to the concessions.

Rogers thereupon set up a scheme to bring in investors, recruited through computerized mailings and telephone solicitations, in which the investors were purportedly leased small plots of gold-bearing land, for which they paid cash and the proceeds of nonrecourse notes (in 1978) or the sale of options (in 1979 and 1980). Since these investments were advertised as promising to yield immediate tax deductions in substantial multiples of the cash paid in, and potential taxable income only if gold was mined, Rogers no doubt expected little, if any, feedback from his investors once their returns were filed and tax refunds received.

The investors were given "proof" of their investments, among other things, in the form of a mineral claim lease signed on behalf of one of Rogers' companies and a copy of a canceled check to represent the loan or option sale proceeds. In fact, the check merely represented the transfer of funds from one Rogers' shell company to another.

The 3,000 or so mineral claim leases bore no relationship to reality. Rather, they were issued sequentially by Rogers' (IME's) staff without reference to any actual geographical location. The lease claim numbers served not to identify specific plots but simply as identifying numbers in IME's filing system.

The bogus nature of the "lease" and development of these individual plots is emphasized by expert testimony at the trial that small plots, such as those purportedly sold by IME-Rogers, could not realistically be developed and mined, separate and apart from exploitation of the entire tract from which the plots were represented to be carved. But it was absolutely essential to the rationale of the tax scheme that the separate plots not be recharacterized as undivided interests since that would have raised the spectre of

partnership treatment under the at-risk rules of sections 465 and 704(d), a fact carefully noted in tax opinion letters distributed with the promotion material.

The GFTD investors determined the number of cubic meters for mining which they were acquiring by dividing a dollar amount per cubic foot into the amount of desired tax deduction. The mineral lease claim issue by IME, reflecting the number of cubic feet of auriferous gravel being bought, had no relationship whatsoever to any actual amount of gravel in any specific and identifiable location.

While IME was selling tax shelters, the gold mining was proceeding on a different track through joint ventures originally consisting of IME-Rogers and TMSA-Kittredge, later augmented by Norsul-Fowler. It is apparent that the concept of these arrangements was that Rogers would be the money man, while Kittredge was to provide the mining concession in Panama, and Fowler was to perform the actual "pick and shovel" work. It is not perfectly clear from the record who controlled the French Guiana concession, but the exploitation of the Paul Isnard tract again was to be a joint undertaking by Rogers and Fowler through their respective companies, DISA and Norsul.

Under Rogers' original agreement with Kittredge, the Panama profits were to be divided 65 to 35 between Rogers' company, DISA, and Kittredge's company, TMSA. By reason of this arrangement, there was no possibility that individual plots could be actually acquired by IME's tax shelter investors.

The details of the arrangements in French Guiana between Rogers and his various companies, and Fowler and his company, Norsul, are totally obscured, but it is obvious that the mining was to be for the benefit of IME-Rogers and Norsul-Fowler, not for the IME tax shelter investors. One can only speculate as to the purpose intended to be served by the directions to Norsul to lay out 100 or so rectangular plots, but since 2,500 or more plots in French Guiana were supposed to have been leased to IME's 1979 and 1980 tax shelter investors, and since only 100 to 200 were ever even laid out on paper, it is obvious that the French Guiana mineral claim leases were totally fictitious.

Kittredge, Fowler, and Rogers, soon had a falling-out over Rogers' continuing reluctance to meet his commitments to supply funds for the gold mining operations. It must have become quickly apparent to Rogers that far more money was to be made from selling fictitious tax shelters than from prospecting for gold in the fetid jungles of Central and South America. The IRS identified 3,025 taxpayers who claimed $118,619,444 in GFTD deductions in 1978 through 1980. Assuming that 20 percent of the deductions were paid in cash, Rogers would have netted almost $24 million through the sale of tax shelters. The actual amount realized was probably substantially greater, since many of the deductions were based upon a four-to-one rather than a five-to-one writeoff, indicative of cash investments larger than 20 percent of claimed deductions.

Petitioners argue that in any event they entered into these transactions with the intention of making a profit. As evidenced by the testimony of petitioners Becker and Aborn, some of the taxpayers, strange as it seems, may actually have thought that they were actually buying gold mines in addition to tax deductions. Without question, though, the real profit that petitioners were looking toward was a large decrease in their tax liability from tax deductions as a result of small cash payments. See *Rose v. Commissioner*, 88 T.C. 386 (1987); *Smith v. Commissioner*, T.C. Memo. 1986-101. It is well established that transactions entered into primarily for tax benefits are not profit motivated. *Fox v. Commissioner*, 82 T.C. 1001 (1984).

Respondent determined the addition to tax for late filing of their tax return by petitioners in docket No. 17018-83. Petitioners have the burden of proof on this issue. Rule 142(a). Since they have offered no evidence to counterpose respondent's determination, we affirm the determination.

In docket Nos. 6463-83, 17018-83, 18518-83, and 31787-83, respondent determined additions to tax for negligence under section 6653(a). Petitioners also have the burden of proof on this issue. Rule 142(a). Except for petitioners in docket No. 6463-83 (Edward M. Becker and Alice M. Becker), petitioners have offered no evidence on this issue, and except in the Beckers' case, respondent's determination is affirmed. At trial, respondent conceded the issue as to the Beckers, so no

section 6653(a) addition to tax for negligence is determined in their case.

At this point, we deem it appropriate to quote the words of the Seventh Circuit Court of Appeals in its affirmance of our decision in *Saviano* (765 F.2d at 654):

> We note that in our resolution of the tax issues in this case we have not violated the agreement of the parties to treat the transactions as having occurred as they are described in the promotional literature. However, we are compelled to note, as did the Tax Court, that only a fool would actually believe that the transactions did in fact occur as described. The many elements of commercial surrealism present in these tax shelters should have put a reasonable person on notice that he was not being shown all the cards in the deck. It is unfortunate that in their haste to obtain tax deductions taxpayers have put their common sense behind them and have become easy targets for tax shelter charlatans. [Fn. ref. omitted]

Petitioners proceeded to trial in this case in the face of the Circuit Court's opinion and that of this Court in *Saviano*, the existence of which petitioners and their counsel were well aware at the time of trial. As previously noted, petitioners complain that *Saviano* was decided on summary judgment without the benefit of evidence which might have been forthcoming at a trial. To use the Circuit Court's words, the "full deck" has now been shown by virtue of the evidence here presented, and on the basis thereof, we have found the IME Gold for Tax Dollars promotion and its concomitant transactions, taken as a whole, to be a fraudulent factual sham.

Section 6621(c)[5] provides, in general, that with respect to any substantial underpayment attributable to tax-motivated

---

[5]Sec. 6621(c) provides:

SEC. 6621(c). INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—

(1) IN GENERAL.—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection.

(2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

(3) TAX MOTIVATED TRANSACTIONS.—

(A) IN GENERAL.—For purposes of this subsection, the term "tax motivated transaction" means—

(i) any valuation overstatement (within the meaning of section 6659(c)),

transactions, the annual rate of interest shall be 120 precent of the established rate. Section 6621(c)(3)(A)(v) includes in the definition of tax-motivated transactions "any sham or fraudulent transaction." This section was added to the Code by section 1535(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750.[6] Section 1535(b) of that act provides that the amendment is to apply to interest accruing after December 31, 1984. We have held that it is constitutionally permissible to apply the amendment retroactively. *DeMartino v. Commissioner*, 88 T.C. 583, 587-588 (1987). See also *Patin v. Commissioner*, 88 T.C. 1086, 1127-1129 (1987).

We impose the section 6621(c) interest on petitioners' substantial underpayments of tax resulting from their tax-motivated transactions and we have no hesitancy in doing so. Petitioners were given ample notice by two Court

---

(ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

(iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092),

(iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and

(v) any sham or fraudulent transaction.

(B) REGULATORY AUTHORITY.—The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account—

(i) the ratio of tax benefits to cash invested,

(ii) the methods of promotion the use of this type of transaction, and

(iii) other relevant considerations.

(C) EFFECTIVE DATE FOR REGULATIONS.—Any regulations prescribed under subparagraph (A)(iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed.

(4) JURISDICTION OF TAX COURT.—In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions.

[6]Sec. 1535, Pub. L. 99-514, 100 Stat. 2750, provides:

SEC. 1535. CLARIFICATION OF TREATMENT OF SHAM OR FRAUDULENT TRANS-
ACTIONS UNDER SECTION 6621(c).

(a) CLARIFICATION OF TREATMENT OF SHAM OR FRAUDULENT TRANSACTIONS.—Subparagraph (A) of section 6621(c)(3) (as so redesignated) is amended by striking out "and" at the end of clause (iii), by striking out the period at the end of clause (iv) and inserting in lieu thereof ", and", and by adding at the end thereof the following new clause:

"(v) any sham·or fraudulent transaction."

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to interest accruing after December 31, 1984; except that such amendment shall not apply in the case of any underpayment with respect to which there was a final court decision before the date of the enactment of this Act.

opinions,[7] in cases decided before this case went to trial, that the deductions claimed through tax shelters which they bought from IME would not be sustained. They chose, however, to proceed, apparently with the forlorn hope of salvaging the deductibility of their out-of-pocket cash. But since the cash was spent for fictitious section 616(a) development expenses, section 6621(c)(3)(A)(v) is applicable, and the 120-percent interest will be imposed.

To reflect the foregoing and concessions in certain of the docket numbers,

> *Decisions will be entered under Rule 155 in docket Nos. 1192-83, 4223-83, 6463-83, 17018-83, 18518-83, and 31787-83.*
>
> *Decisions will be entered for the respondent in docket Nos. 15156-82 and 18923-82.*
>
> *An appropriate order will be issued in docket No. 31411-83.*

---

[7]A third case, *Smith v. Commissioner*, T.C. Memo. 1986-101, also involved the IME promotion, and reached a similar result.