SEYMOUR C. YUTER AND ELINOR V. YUTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Yuter v. Commissioner
Docket No. 32566-84
United States Tax Court
T.C. Memo 1990-108; 1990 Tax Ct. Memo LEXIS 98; 59 T.C.M. (CCH) 17; T.C.M. (RIA) 90108; March 5, 1990
*98 Held, on the facts Ps are not entitled to a deduction for development expenditures under I.R.C. section 616. Held further, increased interest attributable to tax-motivated transaction determined. I.R.C. section 6621(c). Seymour C. Yuter, pro se. James F. Kidd and Debra A. Bowe, for the respondent. NIMS
*124 MEMORANDUM OPINION NIMS, Chief Judge: This case is before the Court on respondent's Motion for Summary Judgment and petitioners' Cross-Motion for Summary Judgment on the Constitutional Tort Issues. Respondent determined a deficiency in petitioners' Federal income tax for the year 1978 in the amount of $ 54,810. The deficiency resulted from two adjustments to income made by respondent, *100 as follows: a. Schedule C [deduction] -- Gold Mining
$ 60,000
b. Income -- Sale of Option
45,000
Respondent has conceded that petitioners did not realize income from a sale of an option. By First Amendment to Answer, respondent asserts an increase in interest based upon a substantial underpayment attributable to a tax-motivated transaction pursuant to section 6621(c), formerly section 6621(d). (All section references are to sections of the Internal Revenue Code in effect for 1978, the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.) Respondent has also moved for an award of damages pursuant to section 6673. Petitioners assert in a motion that their Fifth Amendment rights have been violated. Procedural Background
Respondent has moved for summary judgment pursuant to Rule 121. Petitioners' Opposition to Respondent's Motion for Summary Judgment states the following: The grounds for this opposition are based on the transcript of the partial trial, the admitted and stipulated exhibits, the stipulated facts and especially the accompanying supporting Petitioners' Statement of Material Facts Relevant to the Mine *101 Development Deduction Issue together with the following Petitioners' Memorandum of Points and Authorities, which cites additional material facts. Respondent determined that petitioners are not entitled to a $ 60,000 mining development expenditure deduction for 1978. Petitioner Seymour C. Yuter (petitioner or Dr. Yuter) advanced $ 15,000 to a promoter, IME, in late 1978, and IME putatively advanced $ 60,000 on petitioner's behalf to a Panamanian company for exploitation of a gold mining concession in Panama. In a test case involving nine sets of investors (ultimately not including petitioners' case as a test case) in a promotion called Gold for Tax Dollars, we found as an ultimate fact that "The IME Gold for Tax Dollars promotion was a fraudulent factual sham." Gray v. Commissioner, 88 T.C. 1306, 1322 (1987), affd. sub nom. Becker v. Commissioner, 868 F.2d 298 (8th Cir. 1989), affd. sub nom. without published opinion Armstrong v. Commissioner, 869 F.2d 1496 (9th Cir. 1989), affd. sub nom. Adkins v. Commissioner, 875 F.2d 137 (7th Cir. 1989), affd. sub nom. Kennedy v. Commissioner, 876 F.2d 1251 (6th Cir. 1989). *102 At the trial of Gray v. Commissioner, supra, petitioner testified at length as to his own participation in the 1978-1982 activities involving IME in Panama and French Guiana. Petitioners' case was eventually severed from the cases which proceeded to decision in Gray, since it appeared to the Court that because of petitioner's active participation in IME's Latin American affairs, his case was to some extent atypical of the others. In Gray v. Commissioner, supra, we made extensive findings of fact explicating the entire history of the Gold for Tax Dollars promotion, and since neither party takes exception to our findings in that case, and in fact both parties rely extensively on various parts of such findings, our findings of fact in Gray will be taken as established for purposes of deciding respondent's motion. Furthermore, as stated, petitioner testified at length as to his own activities in Panama and the subsequent French Guiana gold mining venture, and respondent does not challenge petitioner's veracity or credibility. The case is therefore in the posture of presenting for determination the question of whether petitioner's *103 alleged $ 60,000 advance to IME in 1978 qualifies as a development expenditure under *125 section 616(a); i.e., since there is no genuine issue as to any material fact, a decision may be rendered as a matter of law. Factual Background
Petitioners resided in Briarcliff Manor, New York, at the time they filed their petition. Dr. Yuter was among thousands of investors in a tax program called "Gold for Tax Dollars," which was promoted by Gerald L. Rogers through an entity called International Monetary Exchange (IME). The program was structured to take advantage of income tax deductions allowed by section 616 for expenditures paid or incurred for the development of a mine after discovery of ores or minerals in commercially marketable quantities. Investors were promised a four-to-one ratio of income tax deduction to cash investment. See Adkins v. Commissioner, 875 F.2d 137 (7th Cir. 1989), affg. 88 T.C. 1306 (1987). Dr. Yuter, an attorney, holds the degree of A.B. in physics and mathematics from Hofstra College, the LL.B. degree from New York University School of Law, the LL.M. degree from New York University School of Law and the JSD degree from *104 the New York University School of Law. Elinor V. Yuter is a party to this case by virtue of being a party to an alleged mineral lease transaction between IME and the Yuters. Petitioner first heard about the IME program in November, 1978, from his neighbor, Dr. David W. Kraft, a former professor of physics at Cooper Union, who approached petitioner with IME promotional materials. Petitioner got in touch with Dr. Wayne E. Fowler from Norsul who petitioner understood was going to be the operator of Panama Concession 35. Petitioner understood that Fowler had a contract with an entity called DISA which, in petitioner's words, was "to operate, to develop and extract gold from the Concession 35." By certified check dated December 20, 1978, petitioner paid $ 15,000 to IME. By check No. 60-137239, IME paid $ 60,000 to Tuquesa Amalgamated, S.A., $ 45,000 of which was allegedly as the proceeds of a loan from IME to petitioners. Petitioner negotiated his agreement with IME so that it was somewhat different from the forms that were used in the 1978 Gold for Tax Dollars program. The basic difference was that petitioner had the right to select 37,500 cubic meters from any part of the Panamanian *105 concession. He also amended the agreement to exclude IME from arranging for any extraction. He retained that right for himself and arranged in advance for a company called Norsul (through Dr. Fowler) to "extract [ore]" when a good area was found in the concession. Dr. Fowler never found such a spot. Petitioner flew down to French Guiana on April 1, 1982. He was picked up in French Guiana by a man named Albert Lignon and taken to the Hotel Montibou in Cayenne, French Guiana. The next morning he met a man named Lionel Ogilvie, who bore the title of Administrative Director of CMPI SARL. Ogilvie took five bars of gold out of a vault in the hotel and gave two of them to petitioner. Ogilvie told petitioner that he had been instructed to transfer these bars to petitioner as a result of the mining of petitioner's claim in French Guiana during February and March, 1982. The total weight of the two bars of gold was 5.44 kilos, or 5,444 grams, of gold. Ultimately, in 1983, petitioner received approximately $ 9,000 for part of the gold and as of 1985 still retained approximately 232 ounces in a bank someplace in the United States or Canada. Petitioner estimated that in 1985 the value *106 of his remaining gold was about $ 43,000. After receiving the gold bars, petitioner was taken to the jungle site in French Guiana where CMPI SARL had been operating a mine. Upon arriving at the mine site, petitioner found that Norsul had discontinued mining operations and that the situation could fairly be described as chaotic. Later that year, petitioner brought suit against IME, Rogers and various other entities to recover lost profits alleged in the amount of approximately $ 2 million. The court awarded a default judgment for damages to petitioner and his wife in the amount of $ 2,006,756. The Gold for Tax Dollars shelter promotion is described in detail in Gray v. Commissioner, supra. The 1978 IME promotion was tied to a gold mining concession putatively owned by IME in Panama. As previously stated, investors were promised a tax write-off of four dollars for every dollar invested on the theory that these dollars would be borrowed from IME, secured by the gold mining interest acquired by the investors, and spent by IME on the investor's behalf, together with the money advanced by the investor, as development expenses. Thus, for petitioner's $ 15,000 *107 cash advanced, IME promised to lend him $ 45,000 and expend the total $ 60,000 to develop a Panamanian mining claim in Panama sold to petitioners by IME or its agent. In Gray v. Commissioner, 88 T.C. at 1314-1315, the mechanics for establishing "proof" that cash had actually been advanced on an investor's behalf was described as follows: When a check came in, a clerical assistant working for Telecom [an agent of IME] would prepare a "package" to be sent to the client. *126 This included copies of the mineral claim lease, the mineral loan agreement (for 1978) or the option agreement (for 1979 or 1980), a copy of a check drawn on the Republic Bank of Panama by IME and payable to Tuquesa Amalgamated, representing the "development check," and the agency agreement. The IME checks were sent to Panama where they were canceled by the bank and then returned to IME in California, where they were placed in the respective client's file. Eventually, when the paperwork got too heavy, it was all sent to Panama and processed there. When the client's checks to IME originally came in to commence the investment, they were first xeroxed and the check itself was then sent to Panama, *108 presumably to be cashed. The xerox copy formed the basis for processing the client's transaction. A clerical worker would do the following: He or she would type an IME check payable to Tuquesa Amalgamated in the amount of the development cost, which would be sent to Panama to be signed in the name of "T.T. Smith." As previously stated, the name "T.T. Smith" was an alias used by Gerald L. Rogers, the principal promoter of the Gold for Tax Dollars scheme. As stated above, petitioner negotiated certain amendments to his agreement regarding the location of his claim and the extraction of ore from it. Gerald L. Rogers was the IME promoter. Through his shell company, DISA, a Panamanian mining concession called Tuquesa Mining Properties Contract No. 35 was supposed to be exploited and developed for gold mining purposes in 1978. Rogers and DISA went into default on December 27, 1978. No field work had been done on the mining concession, except maintenance of a camp and runway and a brief foot survey of a possible road route from the mouth of Rio Tupisa to Punta Gallina. As previously stated, petitioner made his investment by certified check dated December 20, 1978, which was seven *109 days before the putative developer went into default. Discussion
In Gray v. Commissioner, supra at 1324, we held that: The investors were given "proof" of their investments, among other things, in the form of a mineral claim lease signed on behalf of one of Rogers' companies and a copy of a canceled check to represent the loan or option sale proceeds. In fact, the check merely represented the transfer of funds from one Rogers' shell company to another. Thus, of the $ 60,000 claimed as a section 616 deduction by petitioners, $ 45,000 came from the circular proceeds of a fictitious IME loan. Since the $ 45,000 was never spent by petitioners, their claimed deduction at least to the extent of $ 45,000 is not allowable. The question then remains as to whether any part of the $ 15,000 actually advanced to IME by Dr. Yuter in 1978 is deductible. Taking all facts in the most favorable light to petitioners, as the nonmoving party, we hold that no part of the $ 15,000 was paid or incurred for the development of a mine or other natural deposit. Such sums are therefore not deductible under section 616. *110 Section 616(a) provides in relevant part: (a) IN GENERAL. -- * * * [Absent an election under section 616(b)], there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. * * * As we said in Anderson v. Commissioner, 83 T.C. 898, 908 (1984), affd. without opinion 846 F.2d 76 (10th Cir. 1988): Section 616 obviously contemplates that expenditures for development are incurred on property in which a taxpayer has previously acquired some ownership, leasehold, or other proprietary interest. Expenses for acquisition of the interest, or even for acquisition of a right of access to the property, are not deductible. In order for expenditures to qualify as mining development expenses, the mine must have reached the development stage, and the expenditures must be for the development of the mine. [Citations *111 omitted.] Applying the foregoing standards, manifestly petitioners have not met the requirements of section 616. Dr. Yuter's $ 15,000 check is dated exactly seven days before Rogers, the promoter, defaulted on his obligations to develop the entire Panama tract, as to which only the most elementary steps toward commencing development had been taken at that point. The proceeds of petitioner's check could hardly have reached Panama within seven days under the procedures followed by IME and its agents, much less have been applied toward development. Furthermore, the rudimentary field work which had been undertaken, such as maintenance of a camp and runway and a brief survey of a possible road route, do not constitute mine development expenses within section 616. Anderson v. Commissioner, supra.
*127 In addition, although petitioner negotiated the right to select 37,500 cubic meters from any part of the Panamanian concession, Dr. Fowler, purportedly acting on his behalf, never found a suitable spot for exploitation in Panama. Thus, no development expenditures could have been made by petitioner in 1978. Beyond that, petitioners attempted to deduct the entire *112 $ 60,000 -- $ 15,000 of their own cash and $ 45,000 "loan proceeds" -- as development expenditures, and allocated nothing to the cost of acquiring their interest. It cannot be assumed that IME transferred property to petitioner in Panama without consideration, and it is preposterous to assume that IME would have lent petitioner $ 45,000 solely on the security of a mining claim for which he paid nothing. It follows that petitioner either spent the $ 15,000 to buy a mining claim, or he spent it to obtain a $ 60,000 tax deduction, or a combination of both, but neither gives rise to a mining development expenditure in 1978. In Gray, we also found that a broker's commission of 20 percent of the investor's cash was paid by IME. Such amount would not qualify as a development expenditure under section 616. Petitioners strenuously argue that because IME gave Dr. Yuter an interest in a tract in French Guiana in exchange for his Panama interest, and since some gold mining was actually done in French Guiana in 1982, for which Dr. Yuter received two gold bars having a significant value, he should be allowed a $ 60,000 deduction for 1978. But at the time petitioner made his Panama investment *113 in late December, 1978, there was no agreement that any Panama interest acquired could be exchanged for an interest in a French Guiana mining tract at a later date. Petitioner testified that after strenuous negotiation he managed to obtain this swap on April 5, 1981, over two years after the close of the year in question. Not only does this fact fail to support any argument whatsoever that petitioner incurred development expenditure costs in 1978, on the contrary it does support the conclusion that at least some of petitioner's money was spent to acquire, rather than develop, a mining claim. As we pointed out in Anderson v. Commissioner, 83 T.C. at 908, expenses for acquisition of a mining interest are not deductible. For the foregoing reasons, petitioners' claimed deduction for development expenditures under section 616 is disallowed. Petitioners filed Petitioners' Cross-Motion for Summary Judgment on the Constitutional Tort Issues. Their principal complaint appears to be that their Fifth Amendment rights have been abused because an IRS Appeals office declined to confer *114 with Dr. Yuter and that petitioners were dealt with as IME investors, a class to which they allege they do not belong. Petitioners also object to respondent's determination that petitioners realized $ 45,000 in income through the sale of an option, a position from which respondent has long since receded. Petitioners also complain that they were forced to go to trial in Tampa, Florida, rather than in New York City, near their place of residence. Petitioners' arguments are wholly without merit. First, it has long been held that a trial before the Tax Court is a proceeding de novo; our determination as to a petitioner's tax liability must be based on the merits of the case and not on any previous record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974). Second, the facts of this case abundantly establish that petitioners were IME investors and that their $ 60,000 claimed deduction arose basically from the Gold for Tax Dollars tax shelter promotion which we have labeled a fraudulent sham. Third, petitioners have *115 suffered no detriment from respondent's initial determination that they realized income from the sale of an option. A deficiency which a taxpayer challenges in this Court may not be assessed until the decision of the Court becomes final. Section 6213(a). Furthermore, respondent has abandoned his position regarding the sale of an option. Fourth, petitioners were not prejudiced by being required to participate in the trial in Tampa. As noted, nine other groups of petitioners proceeded to trial in the consolidated case in Florida. Dr. Fowler, whose testimony was important to petitioner, testified in Florida as did other witnesses whose testimony was relevant to petitioners' case. To have required these witnesses to repeat their testimony at a second trial in New York would have been duplicative and an unnecessary expense to the parties, and an unnecessary expenditure of judicial resources. Petitioners state that Mrs. Yuter's health suffered as a result of traveling to Tampa for the trial, but the record does not indicate that the state of Mrs. Yuter's health was brought to the attention of the Court prior to the trial. In particular, a detailed motion to sever and change the *116 place of trial back to New York City, filed March 5, 1985, contains no such reference. Petitioners' cross-motion for summary judgment is therefore denied. Section 6621(c) provides, in general, that with respect to any substantial underpayment attributable to tax-motivated transactions, the annual rate of interest shall be 120 percent of the established rate. Section 6621(c)(3)(A)(v) includes in the definition of tax-motivated transactions "any sham or fraudulent transaction." *128 We cannot but be impressed that Dr. Yuter managed to "extract" two gold bars from Rogers' dubious accomplices in French Guiana in 1982, at what must have been substantial risk to life and limb. But we remain convinced that Dr. Yuter's receipt of the gold bars was in the nature of a settlement and that the Gold for Tax Dollars transaction in which he participated lacked economic substance and comes within the section 6621(c)(3)(A)(2) definition of a tax-motivated transaction. The $ 15,000 which he actually spent he expected to be promptly recovered through tax savings when petitioners filed their 1978 return in *117 April, 1979. We do not believe the Federal Treasury should be expected to finance petitioners' involvement in Gold for Tax Dollars in this manner. For the foregoing reasons, we hold that the underpayment attributable to petitioners' gold mining expenditure deduction to be a tax-motivated transaction. Respondent has moved for an award of damages (now called a penalty) to the United States pursuant to section 6673(a), but because of the somewhat confused procedural posture of this case (albeit to a substantial extent of petitioner's own making), we decline to make an award in this case. (See section 6673(a) as amended by section 7731(a), Pub. L. 101-239, 63 Stat. 2106, applicable to positions taken after December 31, 1989, in proceedings which are pending on, or commenced after, such date.) Respondent's motion for summary judgment will be granted, petitioners' cross-motion for summary judgment on the constitutional tort issues will be denied, respondent's claim for increased interest based upon a substantial underpayment attributable to a tax-motivated transaction pursuant to section 6621(c) will be granted, and respondent's motion for an award of damages (penalty) pursuant to *118 section 6673(a) will be denied. An appropriate order will be issued and decision will be entered under Rule 155.