ESTATE OF SILVIO RAVETTI, DECEASED, DONNA LOGAN, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Ravetti v. Commissioner
Docket Nos. 2913-87, 2914-87
United States Tax Court
T.C. Memo 1994-260; 1994 Tax Ct. Memo LEXIS 260; 67 T.C.M. (CCH) 3064; June 7, 1994, Filed *260 For petitioner: Richard H. Foster. For respondent: Paul J. Krug. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in, additions to, and increased interest on petitioner's Federal income tax: Increased Additions to Tax
Interest
Section Section Section Section Year
Deficiency
[1] 6653(a) 6653(a)(1)
6653(a)(2)
6621(d) 1979
$ 114,255.64
$ 5,713.00
--
--
*
1980
178,738.60
8,937.00
--
--
*
1981
55,242.80
--
$ 2,762.00
**
*
*261 The issues remaining for decision in these consolidated cases are: [2]
1. Are the notices of deficiency (notices) valid? We hold that they are. 2. Is the amount of the distributive share of Silvio E. Ravetti (Mr. Ravetti) of a claimed partnership loss attributable to C & M Ltd. (C & M) an allowable deduction for each of the years at issue? We hold that it is not. 3. Is the amount of the distributive share of Mr. Ravetti of a claimed partnership loss attributable to M & M Properties Ltd. (M & M) an allowable deduction for each of the years at issue? We hold that it is not. 4. Are the investment interest expenses claimed for 1979 and the Schedule C losses attributable to Mr. Ravetti's film and tape distribution activity claimed for 1979 and 1980 allowable deductions? We hold that they are not. 5. Are the travel expenses claimed by Mr. Ravetti for 1981 an allowable deduction? We hold that they are not. 6. Is the parties' stipulation of partial agreement (partial agreement) relating to Glenstall Peltroleum Ltd. (Glenstall Petroleum) to be given effect? We hold that it is. 7. Is a deduction allowable for 1980 for a claimed theft loss with respect to Mr. Ravetti's investment *262 in the Harding Company partnership (Harding)? We hold that it is not. 8. Are the additions to tax for negligence to be imposed on any underpayment for each of the years at issue? We hold that they are. 9. Is any underpayment for each of the years at issue to bear interest at the increased rate provided by section 6621(c) [3] for a substantial underpayment attributable to tax-motivated transactions? We hold that it is to the extent stated herein. *263 FINDINGS OF FACT The instant cases were submitted fully stipulated. All of the facts that have been stipulated are so found. [4]
At the time of the filing of the petitions in the instant cases, Donna Logan (Ms. Logan), the executrix of the estate, resided in California. 1. General Background
Mr. Ravetti married Martha Ravetti (Ms. Ravetti) on July 8, 1950. (Where appropriate, we will refer to Mr. Ravetti and Ms. Ravetti as the Ravettis.) The Ravettis were divorced on March 8, 1982. During the years at issue, Mr. Ravetti was a financial planner and tax shelter promoter. Mr. Ravetti died on June 9, 1986. On August 4, 1986, Ms. Logan, Mr. Ravetti's daughter, was appointed executrix of his estate. Ms. Ravetti also is deceased. The Ravettis filed joint income tax returns for 1979 and 1980. Mr. Ravetti filed a separate return for 1981. Mr. Ravetti executed the *264 1979 return on June 15, 1980, the 1980 return on June 18, 1981, and the 1981 return on October 11, 1982. On or around May 16, 1988, respondent and Ms. Ravetti entered into a settlement agreement that allowed her innocent spouse relief for 1979 and 1980. 2. Claimed Deductions Relating to C & M
C & M is a limited partnership that was organized in the State of California in October 1978. Film Services Corp. (Film Services), a California corporation, acted as the general partner of C & M. Limited partnership interests in C & M were solicited by the general partner in a private offering that called for a purchase price of $ 150,000 for each of the 10 units that were being offered. Mr. Ravetti purchased one of those units. The purchase price for each unit was payable as follows: $ 15,000 cash in 1978, a note for $ 15,000 due on December 31, 1979 ($ 15,000 note), and a note for $ 120,000 due on or before December 31, 1985 ($ 120,000 note). The $ 120,000 note was payable only from film rental proceeds and could be renewed indefinitely for periods of seven years. A limited partnership interest in C & M entitled an investor to 10 percent of the profits and losses of the partnership *265 for each unit acquired. In addition, the limited partners received a 75-percent interest in the capital of the partnership. The general partner was not required to contribute any capital to C & M and was not allowed to participate in C & M's profits and losses. The general partner was, however, entitled to a 25-percent interest in capital and a management fee equal to 3 percent of the partnership's net cash flow. C & M was formed for the purpose of purchasing a feature length motion picture originally titled "Cruise Missile" (film or movie). The name of the film was subsequently changed to "Teheran Incident". C & M purchased the United States and Canadian (except for French Canadian) film rights from 21st Century Film Management Corporation (21st) for a total purchase price of $ 1,500,000, payable to 21st as follows: $ 150,000 in cash before December 31, 1978, a short-term note for $ 150,000 due on or before December 31, 1979, and a note for $ 1,200,000 payable on December 31, 1985 ($ 1,200,000 note) only out of the proceeds received from rentals of the movie. The purchase price for the film rights was not determined by arm's-length negotiations and was inflated to provide *266 C & M's limited partners with substantial tax benefits for their relatively small cash investments. Executed simultaneously with the purchase of the film rights were (1) an agreement under which C & M was to help in the purchase of release prints for the film by providing up to $ 160,000 in cash or notes and (2) an agreement under which C & M was to provide up to $ 200,000 in cash or notes to be applied towards advertising the movie. Pursuant to those agreements, two notes (Ora notes) were executed by Film Services, the general partner of C & M, in favor of Ora Advertising and Marketing (Ora). One note called for the payment of $ 155,000 on or before December 31, 1985, and related to the purchase of release prints. The other note was in the principal sum of $ 200,000 ($ 200,000 note) and related to advertising the film. The Ora notes were payable only out of film rental proceeds and were renewable indefinitely at seven-year intervals. At the time the limited partners agreed to acquire their interests in C & M, they purportedly executed guaranty agreements (guaranty agreements) with respect to their proportionate share of the $ 1,200,000 note and the $ 200,000 note. Like the *267 $ 120,000 note, the $ 1,200,000 note, and the Ora notes, the guaranty agreements were payable only out of film rental proceeds. Thus, the limited partners were not personally liable with respect to their obligations under those notes or the guaranty agreements. Mr. Ravetti made no payments on the $ 120,000 note, the Ora notes, or the guaranty agreements. The film was originally produced by Noble Productions, Inc. (Noble) in coproduction with several foreign producers. Without taking into account contingent compensation arrangements with the actors, Noble's production costs approximated $ 400,000. The movie, which was filmed primarily in Iran and France, starred Peter Graves, Kurt Jurgens, Michael Dante, and John Carradine. Once completed, Noble assigned all United States and Canadian (except for French Canadian) rights in the film to 21st for a total consideration of $ 113,000. The movie received its first United States booking on December 7, 1979, at the Capri Theatre in Florence, Alabama. Thereafter, only three other bookings were secured at theaters in Georgia, Iowa, and Texas. Total box office receipts for the film were $ 1,062. Nontheatrical showings of the movie through *268 January 1981 grossed approximately $ 6,740. All distribution rights for the film were assigned by 21st to Ika Panajotovic, the film's producer and sole owner of Noble. For 1978 and 1979, C & M filed partnership returns (Forms 1065) showing the following receipts, expenses, and net losses: 1978
1979
Gross Receipts
$ 0      $ 0       Interest Income
0    4,216 Less: Depreciation
(83,332)
(500,000)
Net Loss
$ 83,332 $ 495,784 The interest income reported by C & M for 1979 represented interest paid by the limited partners on the portion of their capital investment that was deferred by their $ 15,000 notes payable in 1979. C & M computed the depreciation expense with respect to the movie using the straight-line method and a useful life of three years. The basis of the film claimed for purposes of depreciation was $ 1,500,000. For 1978, the partnership used a basis of $ 1,892,500 for purposes of claiming an investment tax credit. In the opinion of qualified appraisers, the fair market value of the film in December 1978 was approximately $ 36,500 to $ 46,500. 3. Claimed Deductions Relating to M & M
M & M is a limited partnership that was organized *269 in the State of California in December 1978. Film Services acted as M & M's general partner. Mr. Ravetti subscribed to a limited partnership certificate of M & M. On September 28, 1978, Mr. Ravetti paid $ 11,340 to Film Services. Mr. Ravetti executed a promissory note, dated September 25, 1978, and payable to "Meet Me After Midnight" Limited Partnership in the principal amount of $ 62,140. In 1978, Mr. Ravetti executed a document entitled "GUARANTY" which stated that it was for the purpose of inducing 21st to sell a film entitled "Meet Me After Midnight" to "Meet Me After Midnight" Limited Partnership. In 1980, an advertisement for a film entitled "Running Hot" was published in Variety. 4. Claimed Deductions Relating to Investment Interest Expenses and Film and Tape Distribution Losses
A deduction for investment interest expenses in the amount of $ 19,306 was claimed in the Ravettis' 1979 return. In their 1979 and 1980 returns, Schedule C losses were claimed in the amounts of $ 78,000 and $ 5,850, respectively, from Mr. Ravetti's film and tape distribution activity. 5. Claimed Deduction Relating to Travel Expenses
In September 1981, Mr. Ravetti purchased airline *270 tickets costing $ 2,292 from Henderson Travel for Steve Beacher (Mr. Beacher) and himself. Those tickets were for round trip travel from San Francisco through Miami to the Cayman Islands. A deduction for travel expenses in the amount of $ 3,200 was claimed in a Schedule C of Mr. Ravetti's 1981 return with respect to an activity identified as metals mining. 6. Claim of Theft Loss Relating to Harding
The Ravettis claimed in their 1976 return a deduction for $ 48,315 for the distributive share of Mr. Ravetti's claimed partnership loss attributable to Harding. Harding was one of 296 Cal-Am Coal Tax Shelter Partnerships (Cal-Am partnerships) promoted and sold by the Cal-Am Corporation in 1976 and addressed by this Court in Hawley v. Commissioner, T.C. Memo. 1988-77. In that case, we held that the activities of the Cal-Am partnerships were devoid of economic substance. At the trial of Hawley, Joseph R. Laird (Mr. Laird), general partner of Harding, admitted, inter alia, that it was not intended that the Cal-Am partnerships would become involved in the actual mining of coal. On or around September 1980, Laird was indicted under (1) 18 U.S.C. sec. 1341 *271 (1988) for mail fraud, (2) 18 U.S.C. sec. 371 (1988) for conspiracy to commit securities fraud and to defraud the United States, and (3) section 7206(1) and (2) for filing false tax returns and aiding in the filing of false tax returns. See United States v. Crooks, 804 F.2d 1441, 1444 (9th Cir. 1986). Mr. Laird was acquitted of the mail fraud charges by a jury. In a second trial, after the trial judge struck securities fraud as an object of the conspiracy alleged in the indictment, Mr. Laird was convicted of conspiracy to defraud the United States and aiding and abetting the filing of false tax returns. See id.
7. Mr. Ravetti's Mental Condition
On November 10, 1980, Mr. Ravetti was admitted to the Medical Psychiatric Unit of St. Mary's Hospital (hospital) for neuropsychiatric investigation of increased activity, pressured speech, and hypersexuality. While medical examination indicated signs of presenile dementia and depression, Mr. Ravetti was still able to function in his work. Mr. Ravetti was discharged from the hospital on December 5, 1980. During 1983, Mr. Ravetti corresponded with the Internal *272 Revenue Service (the Service) concerning a Form 872-A executed by him as well as the Service's audit of the returns for the years at issue. During that year, Mr. Ravetti also corresponded with others concerning his business and tax affairs. On February 4, 1985, Raymond M. Bolton (Mr. Bolton) was appointed conservator of Mr. Ravetti's estate. 8. Respondent's Determinations
Respondent made and explained the following determinations in the notices. Respondent disallowed Mr. Ravetti's distributive share of claimed losses attributable to certain partnerships, as follows: Partnership Year
Amount
C & M    1979
$ 49,579
1980
50,100
1981
20,884
M & M    1979
28,002
1980
28,433
1981
13,102
Glenstall Petroleum
1981
46,828
Respondent disallowed $ 19,306 of claimed investment interest expenses for 1979 and $ 78,000 and $ 5,850 of claimed losses with respect to film and tape distribution for 1979 and 1980, respectively. Respondent disallowed $ 3,200 of claimed travel expenses with respect to the "Gold for Tax Dollars" tax shelter promoted by the International Monetary Exchange (IME) for 1981. Respondent disallowed $ 94,000 and $ 144,000 of claimed *273 mining development expenses relating to IME's "Gold for Tax Dollars" promotion for 1979 and 1980, respectively. [5]
Respondent disallowed claimed *274 charitable contribution deductions of $ 11,884 and $ 5,942 for 1980 and 1981, respectively, and a claimed medical expense deduction of $ 412 for 1980. [6]
Respondent determined that the additions to tax for negligence applied to the underpayment for each of the years at issue and that each of those underpayments is to bear interest at the increased rate provided by section 6621(c) for substantial underpayments attributable to tax-motivated transactions. 9. Partial Agreement Relating to Glenstall Petroleum
In the partial agreement filed August 28, 1992, the estate conceded 75 percent of the deficiency attributable to the disallowance of all deductions and/or credits with respect to *275 Mr. Ravetti's investment in Glenstall Petroleum. Respondent conceded that the deficiency resulting from the partial agreement was not to be subject to the additions to tax for negligence imposed by section 6653(a)(1) and (2). The estate also conceded that the deficiency was to bear interest at the rate imposed by section 6621(c). The partial agreement further provided: 7. This agreement is solely intended to resolve the question of the amount of deductions to which petitioner is entitled from the GLENSTALL PETROLEUM partnership but does not preclude petitioner from raising other issues which would affect the deficiency resulting from the adjustment to said partnership. 8. Respondent reserves the right to object to the raising of any issues by petitioner not previously pleaded.
The parties subsequently entered into a closing agreement under section 7121 to the same effect as the partial agreement. OPINION The estate bears the burden of showing error in respondent's determinations. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133. *276 The fact that the instant cases have been fully stipulated does not change the burden of proof or the effect of a failure of proof. Rule 122(b); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991). 1. The Estate's Contentions with Respect to the Notices
a. The Estate's Contentions with Respect to the Validity of the Notices
The estate challenges the validity of the notices, relying on Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983). In Scar, the United States Court of Appeals for the Ninth Circuit held that the Commissioner of Internal Revenue (Commissioner) "must consider information that relates to a particular taxpayer before it can be said that the Commissioner has 'determined' a 'deficiency' in respect of that taxpayer." Id. at 1368 (footnote ref. omitted). Where the notice of deficiency does not disclose on its face that the Commissioner failed to make a determination, a presumption arises that a determination was made. See Campbell v. Commissioner, 90 T.C. 110, 113-114 (1988). *277 In the instant cases, the notices contain specific information relating to the Ravettis. They include, inter alia, the exact amounts of Mr. Ravetti's distributive share of partnership loss and investment interest expense deductions claimed in the returns at issue, the exact amounts of taxable income reported in those returns, and the exact amount of the travel expense deduction claimed in the 1981 return. The notices refer to C & M, M & M, and Glenstall Petroleum, the partnerships identified in the returns at issue that gave rise to certain of the claimed deductions. They also specify the years and amounts of the deficiencies determined by respondent against the Ravettis for 1979 and 1980 and Mr. Ravetti for 1981. On the instant record, we conclude that the notices are valid. See Clapp v. Commissioner, 875 F.2d 1396, 1399-1400, 1402 (9th Cir. 1989), affg. an Order of this Court; Campbell v. Commissioner, supra at 115. The estate also contends that the notices do not explain the reasons for respondent's determinations and therefore are arbitrary. We disagree. The estate is wrong in asserting that the notices *278 do not explain the grounds for respondent's determinations; they do. In any event, even Scar v. Commissioner, supra at 1367, on which the estate relies, indicates that a notice of deficiency need not explain the deficiencies determined in order to be valid. The notices are not arbitrary. b. The Estate's Contention with Respect to the Period of Limitations
The estate attempts to argue that the period of limitations has expired and that therefore assessment of the deficiencies determined in the notices is barred. Specifically, the estate asserts that the notices were issued more than three years after the filing of the returns for the years at issue and that certain consents to extend the time allowed for assessment (consents) that were executed by Mr. Ravetti in March and September 1983 were invalid because Mr. Ravetti was incompetent at those times, and the Service was aware of Mr. Ravetti's mental condition at those times. The bar of the period of limitations is an affirmative defense that the estate bears the burden of pleading and proving. Mecom v. Commissioner, 101 T.C. 374, 382 (1993); Coleman v. Commissioner, 94 T.C. 82, 89 (1990). *279 If a taxpayer fails to plead properly the bar of the period of limitations, it is deemed waived. See Robinson v. Commissioner, 12 T.C. 246, 248 (1949), affd. 181 F.2d 17 (5th Cir. 1950). The estate did not plead the bar of the period of limitations in the instant cases. The estate moved for leave to plead the bar of the period of limitations in docket No. 2913-87. The Court denied the estate's motion. Estate of Ravetti v. Commissioner, T.C. Memo. 1992-697. The estate did not seek to amend its petition to plead the bar of the period of limitations in docket No. 2914-87. Accordingly, we will not consider the estate's argument in these cases regarding the period of limitations. Assuming arguendo that the estate were allowed to raise an affirmative defense with respect to the period of limitations, we would not find in its favor. The estate argues that Mr. Ravetti was incompetent at the time the consents were executed and that the Service was on notice of Mr. Ravetti's mental disease, which it claims rendered him incapable of making rational judgments. [7] There is nothing in the record that *280 shows that Mr. Ravetti was in fact incompetent or that the Service was on notice that he was incompetent when the consents were executed in March and September 1983. The fact that Mr. Ravetti had been hospitalized for neuropsychiatric investigation during 1980 does not establish that he was incompetent at those times. The March 1983 correspondence from Mr. Ravetti that is in the record indicates that he was able to manage his affairs in March 1983. The record of a Service employee's telephone conversation with Mr. Ravetti in September 1983 concerning the audit of his returns indicates that he was still able to manage his affairs. It is also significant that a conservator for Mr. Ravetti's estate was not appointed until February 4, 1985, well after the consents at issue were executed. *281 The estate previously attempted to argue in Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343, which concerned the Ravettis' 1976, 1977, and 1978 tax years, that Mr. Ravetti's mental condition invalidated certain consents to extend the time to assess tax that he executed. Under the circumstances presented in the instant cases, our conclusion in that prior case applies with equal force here: "respondent was reasonably entitled to place reliance upon the waivers which were in all respects regular in form." Id.
2. Claimed Deductions Relating to C & M
The contentions of the parties concerning the allowability of the deductions claimed for losses attributable to C & M seem to focus on whether the transactions relating to C & M and the movie were shams. Consequently, before turning to the arguments of the parties here, we will describe the sham analysis used by the United States Court of Appeals for the Ninth Circuit, the court to which appeals in the instant cases would lie. In deciding whether a transaction is a tax-motivated sham, that Court of Appeals considers both the objective economic substance of and a taxpayer's subjective business *282 purpose for the transaction. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987-628, Moore v. Commissioner, T.C. Memo. 1987-626, Sturm v. Commissioner, T.C. Memo. 1987-625, and affg. on this issue Larsen v. Commissioner, 89 T.C. 1229 (1987); Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985). The objective economic substance factor focuses on whether the transaction has economic substance beyond the creation of tax benefits. Casebeer v. Commissioner, supra at 1365. The subjective business purpose factor focuses on whether the taxpayer has a business purpose for engaging in the transaction other than tax avoidance. Id. at 1363. The inquiry under the subjective business purpose factor, like the inquiry under section 183, is whether the taxpayer had a profit objective. See Collins v. Commissioner, 857 F.2d 1383, 1385 (9th Cir. 1988), *283 affg. Dister v. Commissioner, T.C. Memo. 1987-217. As we held in Estate of Ravetti v. Commissioner, T.C. Memo. 1993-418, and Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343, the question whether a profit objective exists is decided at the partnership level. See Karr v. Commissioner, 924 F.2d 1018, 1023 n.4 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988); Fox v. Commissioner, 80 T.C. 972, 1006-1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984); Brannen v. Commissioner, 78 T.C. 471, 503-505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). *284 Objective economic substance and subjective business purpose "are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses." Sochin v. Commissioner, supra.
The estate makes two arguments in an effort to establish the allowability of the losses claimed with respect to C & M. In order to demonstrate objective economic substance, it contends that the movie had a "great cast". The estate previously made this argument in Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343. We rejected it there, and we reject it here. The fact that the movie itself was made by well-known figures in the entertainment industry has little, if any, bearing on the economic substance of the transactions in which C & M engaged. Put simply, the intent of those who made and produced the movie does not establish that C & M's involvement had economic substance. [Id.]
In order to satisfy the subjective business purpose factor, the estate contends that Mr. Ravetti's mental *285 condition during the years at issue did not permit him to form the "tax evasion motivation" required for disallowance of the losses. We previously rejected the estate's argument in Estate of Ravetti v. Commissioner, T.C. Memo. 1993-418, which concerned Mr. Ravetti's 1982 tax year. There, in discussing whether the estate had established the existence of an actual and honest profit objective under section 183 with respect to another partnership (Glenstall Petroleum) in which Mr. Ravetti had an interest, we stated: It is well established that the determination of whether a partnership is engaged in a trade or business or in an activity with the requisite profit objective is made at the partnership level. Fox v. Commissioner, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984); Brannen v. Commissioner, 78 T.C. 471, 503-505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Petitioner seems to be arguing that decedent's mental state prevented him from having the requisite profit objective. If correct, petitioner *286 would nevertheless lose because, to fall outside section 183 (deductions from an activity "not engaged in for profit"), petitioner must prove that the general partner engaged in activities in issue with an actual and honest profit objective. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Petitioner misunderstands both who has the burden (petitioner) and what must be shown. Petitioner failed to meet its burden of proof that the general partners in the partnership possessed the necessary profit objective. See BJR Corp. v. Commissioner, 67 T.C. 111, 130 (1976). * * * the decedent's mental competency or lack thereof is neither relevant nor determinative. See Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343 (involving tax years 1976-1978). Even if we somehow took into account petitioner's lack of mental capacity in making the investment, our determination would remain unchanged. Petitioner has failed to otherwise prove the allowability of the partnership deductions. Specifically, no evidence *287 regarding the profit objective of the general partner was offered. [Id.]
The foregoing reasoning and conclusions are equally applicable here. Accordingly, we reject the estate's argument. In support of her determinations to disallow deductions claimed in respect of Mr. Ravetti's distributive share of partnership losses attributable to C & M for 1979, 1980, and 1981, respondent contends on brief that the transactions relating to C & M and the film were devoid of economic substance and were not entered into for profit. In essence, respondent argues that the transactions were tax-motivated shams. In Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343, we applied the sham analysis used by the Court of Appeals for the Ninth Circuit to the transactions relating to C & M and the film. There, we concluded: The nature of the dealings between the parties, the disparity between the purchase price and the fair market value of the property acquired by Ravetti, and the illusory nature of the financing transaction establish that the transaction lacked economic substance, and that the partnership had no other purpose than tax avoidance. [Id. *288 ]
Nothing in the record in the instant cases causes us to alter the foregoing conclusion we reached with respect to C & M. In particular, we note that the parties here have stipulated that (1) the purchase price for the film was not determined by arm's-length length negotiations, (2) the purchase price for the movie was inflated to provide C & M's limited partners with substantial tax benefits for their relatively small cash investment, (3) the limited partners were not personally liable with respect to the $ 120,000 note, the $ 1,200,000 note, which represented the bulk of the purchase price of the film, the Ora notes, or the guaranty agreements because those obligations were payable only out of rental proceeds, and (4) for depreciation and investment tax credit purposes, C & M used bases of $ 1,500,000 and $ 1,892,500, respectively, whereas the fair market value of the film was approximately $ 36,500 to $ 46,500. On the instant record, including specifically the foregoing facts, we find that the transactions relating to C & M and the movie lacked economic substance and that that partnership had no purpose other than the avoidance of taxes. See Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 728 (9th Cir. 1986), *289 affg. Lahr v. Commissioner, T.C. Memo. 1984-472 (inflated purchase price relative to fair market value of property); Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988) (absence of arm's-length dealing). We therefore sustain respondent's disallowance of Mr. Ravetti's distributive share of partnership losses claimed with respect to C & M. See LaVerne v. Commissioner, 94 T.C. 637, 649-651 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Ferrell v. Commissioner, 90 T.C. 1154, 1198-1199 (1988). 3. Claimed Deductions Relating to M & M
The estate concedes that it has very little information concerning M & M; indeed, the evidence provided by the estate with respect to this partnership is sparse. It consists, inter alia, of the limited partnership certificate filed in 1978, Mr. Ravetti's canceled *290 check to Film Services in the amount of $ 11,430, and a letter to M & M investors dated May 7, 1980, from the promoter of M & M. Respondent contends, and the estate does not dispute, that a promissory note in the principal amount of $ 62,140, a document entitled "GUARANTY", and an advertisement published in Variety on May 7, 1980, also relate to M & M. [8] Consequently, we find that those documents relate to M & M. *291 Respondent contends that the evidence relating to M & M is not adequate to support the deductions claimed by Mr. Ravetti. We agree. The estate has the burden of proof. It therefore must bear the consequences of its inability to produce sufficient evidence to establish entitlement to the deductions claimed with respect to M & M. [9] See Burnet v. Houston, 283 U.S. 223, 228 (1931). On the instant record, we sustain respondent's determination relating to Mr. Ravetti's interest in M & M. *292 4. Claimed Deductions Relating to Investment Interest Expenses and Film and Tape Distribution Losses
The estate claims that the passage of time has scattered witnesses and dimmed memories and that Mr. Ravetti did not keep organized records. The estate's inability to produce evidence does not affect its burden of proof. See Malinowski v. Commissioner, 71 T.C. 1120, 1125 (1979). Although the estate contends that the claimed deductions for investment interest expenses and film and tape distribution losses relate to other unidentified investments by Mr. Ravetti with respect to which evidence is in the record, our review of the record leads us to conclude that the estate has provided no evidence that establishes entitlement to those claimed deductions. [10]
*293 On the instant record, the estate has failed to carry its burden of proof. We therefore conclude that respondent's disallowance of the claimed deductions for investment interest expenses and film and tape distribution losses must be sustained. See Burnet v. Houston, supra;Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). 5. Claimed Deduction Relating to Travel Expenses
The only substantiation the estate has provided for the claimed deduction for travel expenses is two credit card charge forms for the purchase of airline tickets from Henderson Travel in September 1981. Those tickets were for round trip travel from San Francisco through Miami to the Cayman Islands. One set of tickets was purchased for Mr. Ravetti and the other for Mr. Beacher. The cost of each set of tickets was $ 1,146. [11]
*294 On brief, the estate contends that the travel expenses "obviously" were incurred to investigate the French Guiana mine. [12] *295 IME's "Gold for Tax Dollars" promotion was tied to gold mining concessions in Panama and French Guiana. Gray v. Commissioner, 88 T.C. 1306, 1309 (1987), affd. sub nom. Becker v. Commissioner, 868 F.2d 298 (8th Cir. 1989), affd. without published opinion sub nom. Armstrong v. Commissioner, 869 F.2d 1496 (9th Cir. 1989), affd. sub nom. Adkins v. Commissioner, 875 F.2d 137 (7th Cir. 1989), affd. sub nom. Kennedy v. Commissioner, 876 F.2d 1251 (6th Cir. 1989). We thus conclude that the estate admits that the claimed travel expenses were incurred in connection with that promotion. In the Gray case, we held IME's "Gold for Tax Dollars" promotion to be a "fraudulent factual sham". [13]Id. at 1322.
Ordinary and necessary expenses of travel away from home may be deducted when incurred in the pursuit of a trade or business. Sec. 162(a). Ordinary and necessary travel expenses also may be deducted when incurred for, inter alia, the management, conservation, or maintenance of property held for the production of income. See sec. 212(2). The travel expenses at issue were paid in connection with an activity that we have held to be a fraudulent factual sham. Gray v. Commissioner, supra at 1322. They therefore are not deductible under either section 162 or section 212. Even assuming arguendo that the travel expenses at issue were otherwise allowable under section 162 or section 212, section 274(a) precludes the deduction of expenses when incurred with respect to an activity generally considered to constitute, inter alia, entertainment unless the taxpayer establishes that the item was directly related *296 to the active conduct of the taxpayer's trade or business. [14] Vacation and similar travel can constitute entertainment for purposes of section 274. Walliser v. Commissioner, 72 T.C. 433, 439-440 (1979); sec. 1.274-2(b)(1), Income Tax Regs. In addition, section 274(d) precludes the deduction of travel expenses under either section 162 or 212 unless a taxpayer substantiates by adequate records or sufficient evidence corroborating his own statement, inter alia, the business purpose of the travel and the business relationship to the taxpayer of the persons entertained.
The estate has not offered any evidence of the business purpose of the travel to the Cayman Islands or any explanation as to why Mr. Beacher accompanied Mr. Ravetti on that trip. The airline tickets in evidence are not sufficient to carry petitioner's burden under section 274. Sec. 274(d); see Meridian Wood Products Co. v. United States, 725 F.2d 1183, 1188-1190 (9th Cir. 1984). *297 On the instant record, the estate has failed to carry its burden with respect to the travel expense deduction claimed for 1981. We therefore sustain respondent's determination disallowing that deduction. 6. Partial Agreement Relating to Glenstall Petroleum
On August 28, 1992, the parties filed their executed partial agreement relating to respondent's disallowance of a loss claimed in 1981 with respect to Glenstall Petroleum. The partial agreement states, in pertinent part, as follows: 2. For the taxable year ending December 31, 1981 Petitioner concedes 75% of the deficiency attributable to the full disallowance of all of petitioner's deductions and/or credits with respect to petitioner's investment in the Oil and Gas Partnership. * * * 7. This agreement is solely intended to resolve the question of the amount of deductions to which petitioner is entitled from the GLENSTALL PETROLEUM partnership but does not preclude petitioner from raising other issues which would affect the deficiency resulting from the adjustment to said partnership. 8. Respondent reserves the right to object to the raising of any issues by petitioner not previously pleaded.
Pursuant *298 to paragraph 7 of the partial agreement, the estate raises the same arguments with respect to the validity of the notices relating to Glenstall Petroleum and Mr. Ravetti's mental condition that we considered above. We rejected those arguments above and reject them here. On the instant record, none of the issues raised by the estate otherwise affects the concessions relating to Glenstall Petroleum in the partial agreement. 7. Claim of Theft Loss Relating to Harding
In its trial memorandum, the estate seeks to claim for 1980 a theft loss relating to Harding, one of the Cal-Am partnerships that we found to be coal mining tax shelters devoid of economic substance in Hawley v. Commissioner, T.C. Memo. 1988-77. Respondent objects to the estate's effort to raise this issue, contending that it has not been pleaded and is not properly before the Court. [15] We thus must first decide whether the estate may raise this issue. *299 We may refuse to consider an issue raised by a party for the first time in its trial memorandum where doing so would surprise or prejudice the opposing party. See 508 Clinton Street Corp. v. Commissioner, 89 T.C. 352, 353 n.2 (1987). If a party has not been afforded an adequate opportunity to prepare to address a new issue, consideration of it would prejudice that party's ability to present its case. See Estate of Horvath v. Commissioner, 59 T.C. 551, 555-556 (1973). The absence of evidence in joint exhibits and stipulations of the parties concerning a new issue indicates that a party may be prejudiced by consideration of an issue where such evidence is different from that relevant to other issues in the case. See Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 735-736 (1981). Respondent's chief complaint to the raising of the theft loss issue by the estate is that the issue could not properly be raised in the estate's trial memorandum. However, we have allowed new issues to be raised in trial memoranda where no surprise or prejudice to the opposing party is shown. E.g., 508 Clinton Street Corp. v. Commissioner, supra. *300 Even though the estate's trial memorandum was dated September 14, 1993, approximately one week prior to the submission of these cases on September 20, 1993, respondent does not claim surprise or prejudice. Although respondent also complains that the estate's trial memorandum does not set forth the factual basis for its claim of a theft loss, the parties' stipulation of facts filed with the Court on September 20, 1993, contains some information relating to Harding and the Cal-Am partnerships. Respondent does not contend that she will be prejudiced by consideration of the theft loss issue and has stipulated facts relevant to the estate's claim. Consequently, we conclude that the theft loss issue is property before the Court. We will now decide whether those stipulated facts establish entitlement to a theft loss deduction. The stipulated facts relating to Harding and the Cal-Am partnerships are insufficient to establish entitlement to a deduction for a theft loss. In Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343, the estate also attempted to claim a theft loss with respect to Harding. There, we held that the estate had failed to establish *301 either the amount of the loss or the year in which it was discovered, as required by section 165. In the instant cases, the estate attempts to establish that the alleged theft was discovered in 1980, the year Mr. Laird was indicted. Even assuming arguendo that the estate has established the year in which the claimed theft was discovered, it has not established, and has not even attempted to establish, the amount of the alleged theft loss beyond showing the amount claimed with respect to Harding in the Ravettis' 1976 return. In Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343, we stated that: the record establishes that Ravetti claimed a loss of $ 48,315 on his 1976 return. * * * the amount of a claimed tax shelter deduction generally involves an amount substantially greater than the investor's outlay to acquire the investment; e.g., his allocable share of depreciation, investment credit, and the like, so that in the case before us the $ 48,315 loss claimed is meaningless in the context of a theft loss deduction. [Citation omitted.]
Even though our prior opinion should have alerted the estate that showing the amount claimed as a deduction *302 in the 1976 return was insufficient to establish the amount of the theft loss that Mr. Ravetti purportedly suffered in connection with Harding, the estate has not attempted to introduce other evidence showing the amount of that loss. Therefore, the estate has not carried its burden of showing entitlement to a deduction for any such loss. 8. Additions to Tax for Negligence
Respondent determined that the underpayment for each of the years at issue was attributable to negligence. [16] For 1979 and 1980 and for 1981, section 6653(a) and section 6653(a)(1), respectively, impose an addition to tax of five percent on the entire underpayment if any part of it was due to negligence or intentional disregard of rules and regulations. For 1981, if the addition to tax under section 6653(a)(1) applies, a further addition to tax under section 6653(a)(2) is imposed in an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment that is attributable to negligence or intentional disregard of rules and regulations. *303 Respondent does not contend that the underpayments for the years at issue are attributable to intentional disregard of rules and regulations. Consequently, we decide only whether they are attributable to negligence. Negligence is defined as a lack of due care or failure to do what a reasonable and prudent person would do under similar circumstances. Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); see Crocker v. Commissioner, 92 T.C. 899, 916 (1989); Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). The estate's only argument concerning the additions to tax for negligence is that Mr. Ravetti's mental disease precludes their imposition. While a taxpayer's lack of mental competence may relieve him of liability for additions to tax under certain circumstances, [17] as discussed above, the estate has not established that any mental disease of Mr. Ravetti affected his ability to manage his affairs during the years at issue. Mr. Ravetti's hospitalization from November 10, 1980, to December 5, 1980, does not establish that he was *304 incompetent at that time. Although a medical examination of Mr. Ravetti revealed signs of presenile dementia and depression, he was still able to function in his work. Each of the returns at issue includes wage income from Select Income Management Co., indicating that Mr. Ravetti was able to continue his business as a financial planner and tax shelter promoter.
None of the returns at issue was signed during the period of Mr. Ravetti's hospitalization. Various letters in the record authored by Mr. Ravetti in 1983 indicate that he had not become incapacitated by that time. Finally, Mr. Bolton, the conservator of Mr. Ravetti's estate, was not appointed until February 4, 1985, over two years after the return for 1981 was signed by Mr. Ravetti on October 11, 1982. Based on our consideration of the record in the instant cases, we conclude, as we did in Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343, *305 that "petitioner has not established at what point Ravetti may be deemed to have been incompetent to manage his affairs prior to the appointment of a conservator on February 4, 1985." We therefore sustain respondent's determinations with respect to the additions to tax for negligence. 9. Increased Interest under Section 6621(c)
In the notices, respondent determined that the entire underpayment for each of the years at issue is to bear interest at the increased rate provided under section 6621(c). After concessions, [18] the applicability of the increased rate of interest remains in dispute only with respect to the underpayments attributable to (1) $ 94,000 and $ 144,000 of claimed mining development expenses relating to IME's "Gold for Tax Dollars" promotion claimed in the Ravettis' 1979 and 1980 returns, respectively, (2) the deduction for losses claimed with respect to C & M for each of the years at issue, and (3) the deduction for losses claimed with respect to M & M for each of the years at issue. *306 Section 6621(c) provides that the interest payable on a substantial underpayment attributable to tax-motivated transactions is to be computed at 120 percent of the rate otherwise applicable. [19] This increased rate is applicable to interest accruing after December 31, 1984, even though a transaction giving rise to an underpayment was entered into prior to the date of enactment of section 6621(c). Ewing v. Commissioner, 91 T.C. 396, 422 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991). The term "substantial underpayment attributable to tax motivated transactions" means any underpayment of income tax in excess of $ *307 1,000 attributable to one or more tax-motivated transactions. Sec. 6621(c)(2). Section 6621(c)(3)(A) defines the term "tax motivated transaction" to mean, inter alia, any valuation overstatement as defined in section 6659(c), any loss disallowed by reason of section 465(a), and any sham or fraudulent transaction. Section 6621(c)(3)(B) authorizes the Secretary to prescribe regulations specifying other types of transactions that are to be treated as tax motivated for purposes of section 6621(c). Section 301.6621-2T Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), provides that deductions disallowed under section 183 or 165(c)(2) with respect to an activity or transaction not engaged in for profit are also considered to be attributable to tax-motivated transactions. The estate makes no argument directed expressly to the applicability of the increased rate of interest under section 6621(c) to the underpayments of income tax for the years at issue. The estate argues generally that Mr. Ravetti's mental condition should preclude application of any "penalties" to the underpayments for the years at issue. We rejected this argument *308 above and do not find it persuasive here. Even assuming arguendo that lack of mental competence were to excuse a taxpayer from liability for interest at the increased rate provided under section 6621(c), the estate has not established when Mr. Ravetti became incompetent to manage his own affairs prior to the appointment of the conservator on February 4, 1985. On the present record, we conclude that respondent's determination under section 6621(c) with respect to the three transactions remaining at issue must be sustained. Mr. Ravetti's mining activity during the years at issue related to IME's "Gold for Tax Dollars" promotion that we held was a "fraudulent factual sham" [20] in Gray v. Commissioner, 88 T.C. at 1322. We held above that the transactions relating to C & M and the film lacked economic substance and that C & M had no other purpose than tax avoidance. A transaction that lacks economic substance or business purpose is considered a sham for purposes of section 6621(c). McCrary v. Commissioner, 92 T.C. 827, 857 (1989); Cherin v. Commissioner, 89 T.C. 986, 1000 (1987). The estate *309 has failed to carry its burden of proving that the underpayment resulting from the claimed deductions relating to M & M was not attributable to a tax-motivated transaction. Accordingly, we sustain the application of the increased rate of interest under section 6621(c) to the underpayments attributable to IME's "Gold for Tax Dollars" promotion, C & M, and M & M. To reflect the foregoing and the concessions of the parties, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Interest at 120 percent of the underpayment rate provided by sec. 6621 on the portion of the deficiency constituting a substantial underpayment attributable to tax-motivated transactions. Respondent determined that the entire underpayment was attributable to tax-motivated transactions. On brief, respondent concedes that only a portion of the underpayment was so attributable.↩
**. 50 percent of the interest due on the portion of the underpayment attributable to negligence. Respondent determined that the entire underpayment was attributable to negligence.↩
2. The parties stipulated that $ 1,451 of income received in 1980 was not reported in the return for that year. The Estate of Silvio Ravetti (the estate) makes no argument on brief concerning this issue. We therefore consider it to have been conceded. Rybak v. Commissioner, 91 T.C. 524, 566↩ (1988).
3. Although the notices referred to sec. 6621(d), which was added to the Code as sec. 6621(d) by sec. 144(a) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 682, sec. 6621(d) was redesignated sec. 6621(c) by sec. 1511(c) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. We shall refer herein to the redesignated subsection.↩
4. Respondent objected to the admission into evidence of certain statements contained in one of the exhibits. We address this objection below.↩
5. In Gray v. Commissioner, 88 T.C. 1306, 1322 (1987), affd. sub nom. Becker v. Commissioner, 868 F.2d 298 (8th Cir. 1989), affd. without published opinion sub nom. Armstrong v. Commissioner, 869 F.2d 1496 (9th Cir. 1989), affd. sub nom. Adkins v. Commissioner, 875 F.2d 137 (7th Cir. 1989), affd. sub nom. Kennedy v. Commissioner, 876 F.2d 1251 (6th Cir. 1989), we held IME's "Gold for Tax Dollars" promotion to be a "fraudulent factual sham". By order dated Oct. 18, 1991, this Court ruled that the Gray↩ case was controlling with respect to the claimed mining development expenses for 1979 and 1980 that relate to IME's "Gold for Tax Dollars" promotion. Accordingly, we sustain respondent's disallowance of those expenses.
6. On brief, respondent states that the determinations in the notices with respect to charitable contributions and medical expenses are purely mathematical. Those determinations, which are not addressed by either party, are to be taken into account by the parties in connection with the Rule 155 computations in the instant cases.↩
7. To support its claim that the consents are invalid, the estate sought to introduce into evidence a statement in a Service case history worksheet in which a Service employee recorded a telephone conversation with an unidentified woman during which that woman stated that Mr. Ravetti suffered from Alzheimer's disease. The estate sought to admit that statement for the purpose of showing that the Service was on notice concerning Mr. Ravetti's mental condition. Respondent objected to the introduction of that statement into evidence on the ground that it was irrelevant and hearsay. Because we do not reach the period of limitations argument advanced by the estate, we will not admit the statement in question into evidence. We note that, even if we were to have considered the estate's argument, the statement, while relevant, would be inadmissible hearsay. Even assuming arguendo that we were to admit the statement, it would not lead us to conclude that respondent was on notice that Mr. Ravetti was incompetent when he executed the consents. The entry recording the statement was dated September 13, 1983, after the first consent was signed by Mr. Ravetti and apparently before the second consent was signed by him. The statement would not establish that respondent was on notice of Mr. Ravetti's mental condition when he signed the first of the consents at issue in March 1983. Moreover, the statement would not necessarily have put the Service on notice either at the time Mr. Ravetti signed the first consent in question or the second consent in question that Mr. Ravetti was not competent. This is because the other contacts with Mr. Ravetti recorded in the exhibit show that he was able to take care of matters connected with the audit of his returns. There also is nothing in the statement that shows whether the declarant was in a position to communicate reliable information to the Service concerning Mr. Ravetti's mental condition.↩
8. One of the stipulated exhibits consists of a letter signed by Mr. Ravetti protesting proposed adjustments for 1979 that contains various representations concerning, inter alia, M & M. The estate does not contend that those representations constitute evidence of Mr. Ravetti's entitlement to the deductions claimed with respect to M & M or the other deductions disallowed by respondent. In any event, we are not obligated to accept those uncorroborated statements. See Davis v. Commissioner, 88 T.C. 122, 141 (1987), affd. 866 F.2d 852↩ (6th Cir. 1989).
9. Relying on Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855↩ (1983), the estate argues that respondent's disallowance of the deductions attributable to M & M is arbitrary because respondent did not give a reason for her determination in the notices. We rejected this argument above. The estate also argues that respondent's determination with respect to M & M is an "accusation" of "misconduct" that respondent has not supported with any evidence. This argument is not well taken and suggests a misunderstanding of the nature of respondent's determination. Respondent has simply determined that the estate has not established entitlement to the deductions claimed with respect to M & M.
10. For instance, the parties stipulated various documents relating to World Marketing Films and Tapes, Inc., with which Mr. Ravetti was involved in 1979. The estate does not contend that those documents establish the deductibility of the investment interest expenses or the film and tape distribution losses at issue. Rather, those documents appear to relate to Mr. Ravetti's activities in syndicating motion picture tax shelters.↩
11. A deduction of $ 3,200 was claimed in the 1981 return. The only evidence in the record concerning this deduction accounts for only $ 2,292 of the amount claimed. Thus, the estate has not even attempted to carry its burden of proving entitlement to the balance of that amount.↩
12. In support of this contention, the estate offers no evidence other than the suggestion that "An examination of any map of the Caribbean will make clear the connection."↩
13. The parties incorporated into their stipulation of facts this Court's findings of fact in Gray v. Commissioner, 88 T.C. 1306↩ (1987).
14. For purposes of this test, an activity described in sec. 212 is treated as a trade or business. Sec. 274(a)(2)(B).↩
15. The estate contends that respondent should have been aware of this issue because it was raised and considered in Estate of Ravetti v. Commissioner, T.C. Memo. 1993-343↩. The fact that a taxpayer has raised an issue in another proceeding involving different tax years does not necessarily put respondent on notice that the same issue is to be raised in a later case involving different years.
16. Respondent stipulated in the partial agreement that the additions to tax for negligence will not be imposed with respect to that portion of the underpayment attributable to the estate's concession of the disallowance of deductions claimed with respect to Glenstall Petroleum.↩
17. Estate of Ravetti v. Commissioner, T.C. Memo. 1993-418↩.
18. The estate concedes that the underpayment resulting from its concession of a portion of the claimed losses attributable to Glenstall Petroleum is to bear interest at the increased rate provided under sec. 6621(c). Respondent concedes that the adjustments in the notices not discussed herein are not to bear interest at the increased rate provided under sec. 6621(c).↩
19. The increased interest provision was repealed prospectively for returns due (without regard to extensions) after December 31, 1989. Sec. 7721(b), (d), Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2399, 2400. Accordingly, it is still applicable to the underpayments at issue in the instant cases.↩
20. By order dated Oct. 18, 1991, we ruled that the allowability of deductions claimed for the years at issue with respect to mining development expenses is controlled by Gray v. Commissioner, 88 T.C. 1306 (1987). In the Gray case, we sustained application of the increased rate of interest to the underpayments attributable to IME's "Gold for Tax Dollars" promotion. Id.↩ at 1328-1329.